## FIDELITY INSURANCE, TRUST & SAFE-DEPOSIT CO. v. ROANOKE IRON CO.

### (Circuit Court, W. D. Virginia. September 8, 1896.)

1. STATUTORY LIENS—SUPPLIES TO IRON COMPANY—PROPERTY SUBJECT TO.

The R. Iron Co. made a contract with C. Bros., brokers, for the sale of the iron produced at its mills, under which the iron was shipped to C. Bros. on bills of lading in their name, was stored by them, and sold by them, at their discretion, they advancing a stipulated proportion of the market price to the R. Iron Co., and accounting for the proceeds when the iron was sold, no control over the sales being reserved to the iron company. *Held*, that iron so delivered to C. Bros. was not a part of the personal property of the iron company, so as to be subject to the liens of creditors furnishing supplies to the iron company after its delivery, under section 2485 of the Code of Virginia.

2. SAME—CONTRACT LIENS—PERSONAL PROPERTY.

The R. Iron Co., in order to secure the P. Warehouse Co. for advances of money, gave to it, from time to time, written instruments stipulating that the warehouse company should have a first lien on certain specified quantities of iron. All the iron manufactured by the iron company was stored in yards leased by the warehouse company, and kept in its possession. All sales made by the iron company were filled by taking iron from these yards, but, if the amount on hand ever fell below the amount stated as security for the loans, it was at once made good, and an amount greater than that so held as security was usually kept on hand. *Held*, that though no specific iron was set apart to the warehouse company, as it was in possession of the whole, the transaction constituted a valid pledge of the amounts of iron stated as security for the loans, but subject to the lien of persons furnishing supplies to the iron company by virtue of section 2485 of the Code of Virginia.

3. SAME—CARRIER'S CHARGES.

A claim of a common carrier, for freight on the transportation of goods, is not within the provisions of section 2485 of the Code of Virginia, giving to persons furnishing supplies to a mining or manufacturing company a lien on its personal property.

4. CORPORATIONS—RECEIVERS—JUDGMENT LIENS.

When a receiver has been appointed to take charge of the assets of an insolvent corporation, judgments thereafter obtained are not liens on its real estate.

5. PLEDGE—SALE OF COLLATERAL—RECEIVERS.

The holder of collateral security for a loan made to a corporation has a right to sell the same, notwithstanding a receiver of the corporation has been appointed before a default on the debt.

**6. SAME—PURCHASE BY PLEDGEE.**

The holder of collateral security for a debt, who is given, by the terms of the pledge, full power and authority, on failure of the debtor to pay, to sell the collateral at public or private sale, and without advertising or giving the pledgor any notice or making any demand for payment, may buy such collateral, at a sale conducted in good faith, and thereby acquires a good title.

**7. STATUTORY LIENS—SUPPLIES TO IRON COMPANIES—NOTICE.**

The 90 days within which notice must be filed, in order to secure the lien provided by section 2485 of the Code of Virginia for supplies furnished to a mining or manufacturing company, begins to run, in the case of supplies furnished under one contract, and delivered from day to day, from the date of the last delivery; and the lien applies to the whole series of connected items forming a running account, and not only to the deliveries within 90 days before the filing of the notice.

**8. SAME—NATURE OF SUPPLIES.**

Claims for the price of goods furnished to an iron manufacturing company to supply the stock of a commissary store, maintained by such company for the use of its employés, are not entitled to the lien provided by section 2485 of the Code of Virginia for those who furnish to a mining or manufacturing company supplies necessary to its operation.

**9. SAME—AFFIDAVIT—SUFFICIENCY OF VERIFICATION.**

An affidavit made and filed for the purpose of securing a lien under section 2485 of the Code of Virginia, which is verified in another state, but lacks the authentication of the magistrate's signature, required by section 174 of the Code, is not a nullity; but the claimant of the lien may show that the oath was properly administered, and the omission of the authentication may be supplied.

**10. SAME—TIME OF FILING—EXTENSION.**

An order of reference to a master, to ascertain claims against an insolvent corporation, suspends the running of the 90 days' limitation for filing claims to liens, under section 2485 of the Code of Virginia.

**11. SAME—RIGHT TO LIEN—MANAGER'S SALARY.**

Claims for salary by the manager and the secretary and treasurer of a corporation are not labor claims, within the provisions of the Code of Virginia giving such claims a priority.

**12. SAME—LIEN FOR LABOR—NOTICE.**

Notice under the Virginia statute of a claim to a lien for labor, under a contract to be performed at so much per day, may be filed within 90 days after the completion of the contract; and such a claim will not be severed, and only so much allowed as falls within 90 days before the notice.

This cause was, by a former decree, referred to a master commissioner, to take an account, and report upon the rights of the plaintiff company, trustees, and of the holders of the bonds issued under a deed of trust or mortgage made by the defendant, the Roanoke Iron Company, dated June 9, 1891, an account of all the debts and liabilities of said company, the liens on the property of said company, and the priorities of such liens; also, an account of all the assets and property, real and personal, of every kind, and all interests in property belonging to said defendant company.

To the report of the master, made in pursuance of the decree of reference, a number of exceptions have been filed by different creditors of the defendant corporation, and these present the questions to be considered. For convenience, the court will consider them in numerical order, relative to their importance.

Richard C. Dale, for complainant.

Seward, Guthrie, Morawets & Steele, for Crocker Bros.

John Douglass Brown and Scott & Staples, for Philadelphia Warehouse Co.

· Griffin & Glasgow, for Mill Creek Coal & Coke Co.

Blair & Blair, for New York & V. Mining & Mineral Co.

Watts, Robertson & Robertson, Lucien Cocke, and Thos. W. Miller, for certain supply lien creditors.

Before SIMONTON, Circuit Judge, and PAUL, District Judge.

SIMONTON, Circuit Judge. 1. The first question brought to our attention is that between Crocker Bros. and the receiver. Crocker Bros. is a firm of brokers in New York, dealing principally in iron. They were sole agents for the sale of the product of the Roanoke Iron Company. Their agency began in 1889. The course of business was this: Crocker Bros. would make contracts for the sale of the iron product of the company, and send orders therefor to Roanoke. The company would fill the orders, shipping the iron direct to the purchaser. This iron never came into the actual possession of Crocker Bros. Crocker Bros. guarantied all their sales, and each month furnished an account current. If the iron company wanted money from the sales at any time, Crocker Bros. furnished it, whether they had made collections on the sales or not. As they were del credere agents, this was reasonable. Until 1893 the business was prosperous, and sales of iron were readily made. But in 1893 business became slack. There was depression all over the country, and the iron company had to borrow money to meet current expenses for labor, supplies, etc. They had sundry interviews with Crocker Bros., and verbal and written communications in 1893. On August 2, 1893, Crocker Bros. wrote to the Roanoke Iron Company as follows:

"We beg to recapitulate terms of agreement decided upon in our various conversations and letters, as follows, viz.: We are to continue as the sole and exclusive agents of your company for the sale of the entire product of your furnaces and mills, collecting the proceeds, and remitting to you in due course. In the conduct of the business, we will advance if and when desired against iron shipped and properly put into our legal possession to the extent of three-fourths (¾) of the market value of such iron, freight and any expenses to be considered as part of said ¾ advance, and margins to be kept on such basis."

The letter then goes into detail as to rendering account sales and accounts current, the rate of interest, the remuneration of the agents. The duration of the agreement is fixed at five years, and thenceforward indefinitely, unless six months' notice in writing be given of its discontinuance. The Roanoke Iron Company to have the right to modify remuneration and the services of the agents by giving ninety days' notice, in these particulars only; none other is mentioned. The commission may be reduced from 4 per cent. to 2½ per cent. on gross sales, covering only, however, commission for selling, without guaranty of sales, and without any obligation to make advances. In reply, the Roanoke Iron Company approve all the terms but the duration of the contract, which they propose to limit to one year, and after that subject to the six-months notice. This was accepted. Up to that time, as has been seen, Crocker Bros. had no possession, actual or constructive, of the product of the iron

company. They made contracts of sale, which the company filled by shipment from their works in Virginia. Henceforward, when Crocker Bros. made advances, iron upon which the advances were made was shipped on the Norfolk & Western Railroad by the iron company, on bill of lading in the name of Crocker Bros., and by their direction, was sent to them at Lambert's Point, Va., where it was stored in the name of Crocker Bros., and marked. Afterwards the place of shipment was changed to a lot in Roanoke, under the complete control of Crocker Bros., and there the iron was in like manner stored and marked. There were 4,000 tons of iron at Lambert's Point, and some 2,000 tons in Roanoke,—some 6,000 tons in all. Certain creditors of the company for supplies claim that this iron is subject to a lien they have under the statute of Virginia, and have insisted that the receiver should take possession of it for this purpose. On this point the receiver asks instructions. All of this iron held by Crocker Bros. was in their possession before the supplies were furnished for which the lien is claimed, except, perhaps, 144 tons.

The supply creditors base their claim upon section 2485 of the Code of Virginia. That section provides:

"All persons furnishing supplies to a mining or manufacturing company necessary to the operation of the same shall have a prior lien upon the personal property of such company, other than that forming a part of its plant, to the extent of the money due them for such supplies. And also a lien upon all the estate, real and personal, of such company (plant not excepted), which said last lien, however, upon all such real and personal estate, shall be subject and inferior to any lien by deed of trust, mortgage, hypothecation, sale, or conveyance made and executed and duly admitted to record prior to the date at which such supplies are furnished."

The question then is: Is this iron in the possession of Crocker Bros. a part of the personal property of the Roanoke Iron Company? It is evident, both from the reason of the thing and from the words of the statute, that no lien can be acquired by any person furnishing supplies until he has furnished the supplies, and then the lien can only attach on the property at that time and thereafter the property of the company. If, therefore, this iron ceased to be the property of the Roanoke Iron Company before the supplies were furnished, clearly there is no lien. This iron was transferred from the possession of the Roanoke Iron Company, and delivered to Crocker Bros., with a bill of lading, which was a muniment of title. Means v. Bank, 146 U. S. 627, 13 Sup. Ct. 186. Thenceforward the iron passed to them. Under the terms of the contract appearing in the letter quoted above, no provision was made for the return of the iron in specie, in whole or in part, to the iron company. It was to be held by Crocker Bros., to be sold by them, to be kept in their actual possession, and so ready for delivery. The first proceeds of sale were to go to their advances; then all charges were to be deducted; and, after an account for these was made up, then the iron company had a right to the net balance, if any. Even were this the ordinary case of a consignment to a factor, selling under a del credere commission, the title to the iron would have passed to Crocker Bros., and out of the iron company. In Jones on Liens the law is stated:

"An agent acting under del credere commission has a lien for his advances and commissions. A bill of sale by his principal to him of the goods in his possession is in effect a foreclosure of his lien on them." A bill of sale works, constructively, delivery of personal property. It is the delivery which passes the title to personal property. In the present instance there was an actual manual delivery of the personalty, accompanied by a bill of lading,—a muniment of title. But this is not the ordinary transaction between a factor and his customer. Goods ordinarily are sent to a factor for the purpose of sale. That is the sole purpose for which they are sent, and the reason for his possession and control of them. If, pending the negotiations for or the offer of a purchase, he lay out any money for the principal, he can reimburse himself from the proceeds of the sale when made. Such advances, however, are only incidental to the sale, which is the primary purpose and object of his agency. But, as he only has control of the goods to sell them, he has only a qualified property in them, sufficient to protect him in his possession while carrying out the purpose of his agency. But he is not the owner of the goods. Jones, Liens, § 474. He is still the agent of, and under the orders of, his principal, and can be controlled by him. But in the present case the iron was delivered to Crocker Bros. for the purpose of obtaining a loan of money. It was delivered with every formality for the passage of the legal, as well as the beneficial, title to Crocker Bros. True, sales of it were to follow, not, however, under the direction of and for the benefit of the Roanoke Iron Company, but under the control and direction of, and to reimburse, Crocker Bros. Over these sales no control whatever was reserved to the iron company. There is some ambiguity in the contract upon the question whether Crocker Bros. could look to any other means of reimbursement than these sales. What of the property, then, was left in the Roanoke Iron Company? It had the right to an account from Crocker Bros., and on such account a demand for the balance of money appearing due thereon, the balance, a result after reimbursing the loans and payment of the expenses. That is the only interest the iron company had in the transaction.

Now, when we speak of a lien on personal property, we mean something which can be enforced by keeping in possession, or which can be reduced into possession. It must be property visible and tangible, capable of being reduced into possession. But in the present case, when advances for supplies were made, the iron had ceased, as such, to be the property of the Roanoke Iron Company. All that was left of it was an equity to call Crocker Bros. to an account. There is no such thing as a legal lien on an equity. When there is no legal right, there is no legal remedy. Badlam v. Tucker, 1 Pick. 389; Scott v. Scholcy, 8 East, 483. When the iron is disposed of, Crocker Bros. must account with the receiver for the net balance which remains, and it will be applied by him to the payment of creditors, according to their legal or statutory priorities. Meanwhile, the possession of Crocker Bros. cannot be disturbed.

2. The Philadelphia Warehouse Company presents a claim which said warehouse company alleges is a lien on several thousand tons

of pig iron and muck bar, of the product of the defendant company. The facts of this case are these: The Roanoke Iron Company made contracts for the loan of money with the Philadelphia Warehouse Company. The nature and character of each loan are clearly stated in the able report of the standing master. One example gives the case of all. On March 14, 1893, the warehouse company lent to the iron company $5,000, less the discount, payable July 12, 1893. On the same date the iron company made a written paper, in the nature of an invoice consignment contract, in which, after an itemized account or invoice of 715 tons of pig iron deposited with and confided to the care and management of the warehouse company by the iron company, the merchandise belonging to the iron company, and the money having been advanced by the warehouse company to the iron company upon the security of the merchandise, it was then stipulated that the warehouse company, for this advance, was to have a lien prior to all other claims on this merchandise, and, in case the $5,000 was not paid, the warehouse company was to have the right to sell the same, and receive the net proceeds, to be applied to the payment in full of the amount due. This loan was extended from time to time, and, when the pig iron fell in value, a new invoice was made for a larger number of tons of iron, the old invoice being canceled. This contract was evidenced by promissory notes. At each renewal the old note was canceled. There were several loans of this character, all secured in the same way, renewed from time to time, each renewal and the security governed by the same practice. The amount of $60,000 and upward were loaned, and the security is 7,881 tons of pig iron and 857 tons of muck bar. All of this iron is now on premises held by the warehouse company under lease, being a part of a larger quantity of iron on the same premises, the warehouse company having no property of any kind in the surplus. When these loans began, and during the subsequent negotiations and creation of the rest of the loans, the following plan was adopted: The iron was bulky and heavy, and very expensive in handling. The warehouse company therefore leased parcels of land from the iron company next to the cast house of the iron company, and on this the iron was stored; the warehouse company having an agent specially designated in charge of their iron, and signs being put up on the premises on which appeared "Storage Yard Philadelphia Warehouse Company." The agent of the warehouse company, custodian of this leased land, was R. P. Patterson, at the time of his appointment manager also of the iron company's yards. He was appointed March 14, 1893, the date of the first loan, and resigned 15th of January, 1895. He was succeeded by John M. Langton, who was at the time and afterwards the foreman of the yards of the iron company. All of the iron made by the iron company was stored on these leased premises. All sales effected by the iron company in due course of business were filled by taking the iron from time to time as needed from the iron so stored, care being taken that the iron on the leased premises should not fall below the amount stated to be the security on these loans. Occasionally, notwithstanding this care, there would be such an output of shipment that the amount of iron in the yard

fell below this amount, sometimes to the extent of 200 tons. This, however, was corrected as soon as possible. But no specific iron was set apart out of the mass for the warehouse company. All of the iron of the iron company was on the premises of the warehouse company, and in that mass it was understood between the two companies that a certain number of tons, less than the whole, was pledged to the warehouse company. The controversy is between the parties who furnished supplies to the iron company and the warehouse company. Have the former a lien prior to the latter?

The first question is, was this arrangement between the iron company and the warehouse company a valid pledge? Two things are essential to constitute a pledge: First, possession **by** the pledgee; second, that the property pledged be under the power and control of the creditor. "The difference," says Bradley, J., in Casey v. Cavaroc, 96 U. S. 477, "between a mortgage and a pledge is that title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge; and, if possession be once given up, the pledge, as such, is extinguished." See, also, Christian v. Railroad Co., 133 U. S. 243, 10 Sup. Ct. 260. In Easton v. Bank, 127 U. S. 532, 8 Sup. Ct. 1297, it is thus stated: "When personal property is pledged, the pledgee acquires the legal title and the possession. In some cases, it is true, it may remain in the apparent possession of the pledgor, but, if so, it can only be when the pledgor holds as agent for the pledgee." One step further: The pledgee may deliver the personalty pledged again to the pledgor. If he do this for a temporary purpose only, the goods to be redelivered, or if they be put into the hands of the pledgor for sale as agent for the pledgee, or if the pledge be of choses in action for collection by the pledgor for the use of the pledgee, this will not defeat the pledge. But the delivery back by the pledgee or with his consent, without more, terminates the pledge. Casey v. Cavaroc. 96 U. S. 478.

In the case at bar, all the iron, output of the iron company, was delivered upon land in the possession of and held by the pledgee. The leases reserved only a right of way over the lands to the iron company and its agents, making this provision specially: "Provided it (the iron company) at no time interferes with the pig iron or other material stored thereon, without first receiving written authority from the party of the second part [the warehouse company] for the removal or other disposition of said material." In a certain amount of this iron the warehouse company had a qualified right. It had, however, possession of the whole, and, although it did permit the iron company from time to time to sell from this whole parts of the iron, still this was done by its permission, and evidently with the understanding that the amount of iron necessary to secure the warehouse company should remain in its possession, for, when that amount was encroached upon, it was immediately made good. In this feature the case at bar resembles Macomber v. Parker, 14 Pick. 497, a case quoted, commented on, and approved in Casey v. Cavaroc, supra. In that case, and in this, the possession of the whole of the goods, a part of which was pledged, was in the pledgee, who per-

mitted the pledgor to dispose of a part of the whole. The supreme court of Massachusetts held that this did not defeat the idea of a pledge, or invalidate the pledge. It will be observed that this is not an attempt to pledge a part of a thing in bulk without separation from that of which it constitutes a part, as in Golder v. Ogden, 53 Am. Dec. 618, or in the cords of bark used as illustration by Jones, Pledges, p. 21, § 26, and Collins v. Buck, 63 Me. 459, the goods in bulk remaining in the possession of the pledgor. But the case is like Weld v. Cutler, 2 Gray, 195, where a mortgage of a part of a pile was held good, although unseparated, because the whole pile was delivered into the possession of the mortgagee. Looking at the question, is this a valid pledge? And, applying the test, was there delivery to the pledgee? The fact that the whole of the iron, a part only of which was pledged, was delivered to the pledgee, shows that, the whole having been delivered, the part also must have been delivered, and the question must be answered in the affirmative.

The next question is, is this lien of the pledgee prior to that of the supply creditors? As has been seen, the warehouse company holds the iron in pledge. The distinctive character of the pledge is that it does not transfer title, but transfers possession. Bradley, J., in Casey v. Cavaroc, supra. It is a bailment of personal property, as security for some deed or engagement. Story, Bailm. § 286. The general property remains in the pledgor, with a qualified property in the pledgee, giving the pledgee every right which can secure the possession. It is, in the strictest sense, a common-law lien. Peck v. Jenness, 7 How. 620. The supply creditors claim under the statute law of Virginia. The law now of force in Virginia is the act approved February 15, 1892 (Acts 1891–92, p. 362, c. 224, amending the Code of Virginia adopted in 1887). This Code of Virginia is a statute speaking from its date, and has all the formalities of an act. By this act, supply creditors have a prior lien on all the personal property of the corporation, except that forming a part of the plant, and a lien upon all the real and personal property of the corporation, whether part of the plant or not, subject and inferior to any lien by deed of trust, mortgage, hypothecation, sale, or conveyance, executed and recorded prior to the date on which supplies were furnished. The language of the statute is obscure. The history of the legislation throws some light on it. On March 21, 1877, an act was passed entitled "An act to secure the payment of wages or salaries to certain employés of railway, canal, steamboat, and other corporations." The terms of this act sought to give to all employés, and to all persons furnishing supplies to transportation companies, a prior lien on the franchises, gross earnings, and on all the real estate and personal property used in operating the corporation, over any mortgage, deed of trust, sale, conveyance, or hypothecation executed of said property after the date of that act. In 1879 an act was passed entitled "An act to amend and re-enact the first and second sections of an act approved March 21st, 1877, entitled 'An act,'" etc. (as above). This act of 1879 amended the former act by including in it "any mining or manufacturing company chartered under or by the laws of this state, or doing business within its limits," and by adding a proviso that the liens of employés

and officials shall be prior to all other liens. Both of these acts, so far as they related to supply creditors, were held unconstitutional, the title of the act betraying no purpose as to them. Fidelity Ins., Trust & Safe-Deposit Co. v. Shenandoah Val. R. Co., 86 Va. 1, 9 S. E. 759. Then came the Code of 1887, re-enacting the act of 1879 (section 2485). Next we have the act of February 15, 1892, entitled "An act to amend and re-enact sections 2485 and 2486 of the Code of Virginia, in relation to the lien of employés, &c., of transportation, mining, and manufacturing companies on franchises and property of said companies, and how the same may be perfected and enforced." This act retains the provision in favor of employés, giving them a prior lien on franchises, gross earnings, and all the real and personal property of the corporation, notwithstanding any prior instrument creating a lien, and gives to persons furnishing supplies a modified security, that is, a prior lien on all personal property not used in the plant, and a lien on all the property, real and personal,—subject, however, to liens created by deeds or instruments in writing properly recorded prior to the date of the supplies furnished; that is to say, upon all the personal property of the company not used in the plant, they have a prior lien; on all the real estate, whether used in the plant or not, and apparently on all the personal property used in the plant, a lien inferior to a lien by deed of trust, mortgage, etc. This iron held by the warehouse company was the property of the iron company not used in its plant, a bailment in the hands of the warehouse company, upon which it had a lien. The act of the legislature of Virginia of force when the contract was made, and held to be valid in Virginia Development Co. v. Crozer Iron Co., 90 Va. 126, 17 S. E. 806, declares that the claims of persons furnishing supplies have a prior lien on all the personal property of a corporation not a part of its plant. This act entered into and was a part of the contract made by the warehouse company, and it received the bailment subject to the provisions of the act. This case seems to come within the words of the statute, and the conclusion cannot be avoided that the supply creditors have a lien on this iron prior to that of the warehouse company. Stress is laid upon the use of the word "prior" in characterizing this lien, the comparative, and not the superlative, degree. But, as between two liens or in a class of liens, the one superior to the others very properly can be said to be prior.

PAUL, District Judge. 3. The Norfolk & Western Railroad Company files a large claim against the defendant company as freight charges for transporting ores, coal, and other supplies purchased by the defendant company. The railroad company claims a lien under a provision of the Code of Virginia (section 2485), as amended by an act of the general assembly (chapter 224, p. 362, Acts 1891-92), giving to persons furnishing supplies to a mining or manufacturing company necessary to the operation of the same a prior lien upon the personal property of such company, other than that forming a part of its plant, etc. It is very clear to the court that freight charges by a railroad company against a manufacturing company are not within either the letter or spirit of the statute. The object of the statute

was to create a lien in favor of persons furnishing supplies in order that they might be protected against loss, where they have contributed material necessary to the operation of the manufacturing company. It gave them a statutory security for the debts due them for supplies. At common law, creditors had no lien on the property of a manufacturing company for the purchase price of materials furnished, and we see the reason for the enactment by the legislature of a supply lien law. But no such reason existed for securing a railroad company for the payment of its freight charges. Railroad companies are common carriers, and, as such, have a lien for the freight on the materials which they carry. Seventh Nat. Bank v. Shenandoah Iron Co., 35 Fed. 436. The railroad company in this case had that lien, and could only lose it by parting with the possession of the supplies it carried, without requiring the payment of its freights. The evidence shows that the Norfolk & Western Railroad Company exercised this right of lien on several occasions, by refusing to allow the materials to be unloaded from its cars until the freight had been paid, or its payment satisfactorily arranged. This exception will be overruled.

The Norfolk & Western Railroad Company also excepts to the report of the master on the ground that he fails to report as a lien a judgment for $31,943.27, obtained by said railroad company against the Roanoke Iron Company, at the April term, 1895, of the hustings court of the city of Roanoke, Va. The receiver in this cause was appointed on the 26th day of January, 1895. It is well settled that, when a receiver has been appointed to take charge of the assets of an insolvent corporation, judgments thereafter obtained are not liens on the real estate of the corporation.

4. The Mill Creek Coal & Coke Company excepts to the report of the master, on the ground that he reports that said Mill Creek Coal & Coke Company is not entitled to 10 mortgage bonds of the Roanoke Iron Company, of $1,000 each, which were sold as collateral security, and purchased by said Mill Creek Coal & Coke Company. As to these bonds, the master reports as follows:

"At the time the receiver of the Roanoke Iron Company was appointed in this cause, five of its temporary 6 per cent. mortgage bonds, of $1,000 each, were held by the First National Bank of Roanoke, Va., 'and five were held by the Fidelity Loan & Trust Company of Roanoke, Va. (ten in all), as collateral security for the payment of the two negotiable notes of $3,000 each, both dated December 29, 1894, and payable at thirty days,—one at said First National Bank, and the other at said Fidelity Loan & Trust Company, of Roanoke, Va., made by the Roanoke Iron Company to Joseph H. Sands and the Mill Creek Coal & Coke Company, and indorsed by said Sands and the Mill Creek Coal & Coke Company. On the 31st day of January, 1895, at the request of the holders of the two notes, respectively, of $3,000 each, namely, the First National Bank of Roanoke and the Fidelity Loan & Trust Company of Roanoke, Va., the same were duly protested for nonpayment. It seems that the two notes of $3,000 each were paid by the Mill Creek Coal & Coke Company, and the same were duly assigned by the First National Bank and the Fidelity Loan & Trust Company to the Mill Creek Coal & Coke Company. These assignments of the two notes carried with them the ten bonds, of $1,000 each, of the Roanoke Iron Company, which had been pledged as collateral security; and on the 19th day of February, 1895, the 10 bonds so placed as collateral were sold at public auction in the city of Roanoke, Va., in accordance with the provisions of the two collateral notes of $3,000 each. At this sale the Mill Creek Coal & Coke Company

became the purchasers of said ten (10) bonds, at the price of $6,042.32, or $3,021.16 for the five bonds theretofore held by the First National Bank, and $3,021.16 for the five bonds theretofore held by the Fidelity Loan & Trust Company. By virtue of this sale and purchase, the Mill Creek Coal & Coke Company became the owners of the said ten bonds of the Roanoke Iron Company, of $1,000 each; and it has proved and is claiming the same in this cause to the full value thereof."

The master holds in his report that, by the appointment of the receiver in this cause, the relation of the Roanoke Iron Company to this transaction and to all its contracts was changed; that its title to its property and all its means with which to meet this and other obligations passed from it to the receiver; that an order of reference had been entered in this cause when the 10 bonds were put up and sold at public auction. The court does not think this position is correct. It is contrary to the doctrine laid down in Jerome v. McCarter, 94 U. S. 734, which was a case in which a receiver had been appointed. There certain mortgage bonds had been pledged as collateral security for loans, and the court held that the pledgees had a clear right to use them, either by sale or by collateral, until the full amount of the debt due from the mortgagors is satisfied. Exception sustained.

Frederick Gwinner, a holder of 12 of the mortgage bonds, also excepts to the report, because the master fails to report that said Gwinner is the owner of said bonds. Touching the history of these bonds, the following facts are admitted: Frederick Gwinner held 12 bonds of the Roanoke Iron Company, of the denomination of $1,000 each, payable to bearer, as collateral security for a note made by the Roanoke Iron Company, payable to him, dated 29th April, 1893, for $5,000. On the 11th day of January, 1895, the note aforesaid, for $5,000, being due and payable, Frederick Gwinner had the collateral sold at the stock call of the Pittsburg Stock & Oil Exchange, at which sale they were bought by George B. Hill & Co., who, in the purchase of said bonds at said sale, were acting, in their purchase aforesaid, as brokers and agents for said Frederick Gwinner, and purchased said bonds for said Frederick Gwinner. Following is the note:

"$5,000.  Roanoke, Va., April 29th, 1893.

"On demand, —— days after date, for value received, the Roanoke Iron Company promises to pay to Frederick Gwinner, at the First National Bank of Roanoke, Va., five thousand dollars, homestead and all other exemptions waived; having deposited with said Frederick Gwinner, as collateral security for the payment of this note, twelve temporary six per cent. bonds of the Roanoke Iron Company, of the denomination of one thousand dollars each, with such additional collaterals as may from time to time be required by Frederick Gwinner, and which additional collaterals they hereby promise to give at any time on demand. If these additional collaterals be not so given when demanded, then this note to be due; and rebate of interest taken shall be allowed on payment prior to maturity. And the Roanoke Iron Company hereby gives to said Frederick Gwinner full power and authority to sell and assign and deliver the whole or any part of said collaterals, or any substitute therefor, or any additions thereto, at public or private sale, at option of said Frederick Gwinner on the nonperformance of the above promises, all or any of them, or at any time thereafter, and without advertising or giving to the Roanoke Iron Company any notice, or making any demand of payment."

The contention of counsel for exceptants is that Gwinner, being the pledgee of these bonds as collateral security for the payment of the note for $5,000, executed to him by the Roanoke Iron Company, could not become the purchaser thereof at a sale of the same. It is undoubtedly true that where a pledgee, without authority sells negotiable collateral paper, he cannot become the purchaser. Colebrooke, Collat. Sec. § 126. But this doctrine does not apply in a case like this, where the pledgee is given full power and authority, on the failure of the debtor to meet the obligation for which the collateral is given, to sell the collateral at public or private sale, and without advertising or giving to the pledgor any notice or making any demand for payment. The sale of the collaterals was made at the suggestion of the secretary of the Roanoke Iron Company, the pledgor. Gwinner himself did not attempt to make the sale, but it was made publicly, at the stock call of the Pittsburg Stock & Oil Exchange, and the bonds were purchased by Hill & Co., brokers, as agents of Gwinner. As far as the evidence shows, these collateral bonds constituted the only security he had for the payment of the $5,000 debt due him, and, as appears by the proceedings in this cause, they were of uncertain value. It would be imposing great hardship and injustice upon the pledgee, under the circumstances in this case, to say that while acting under the authority given him by the pledgor, and in good faith, he shall be required to stand by, and see the only security he has for the payment of his debt perhaps sacrificed, and he not permitted to protect his interests in the only way he can, by becoming a purchaser himself. The exception will be sustained, and, in the decree to be entered, Gwinner will be recognized as the owner of the bonds.

5. The New York & Virginia Mining & Mineral Company excepts to the master's report, on the ground that the master has allowed on its claim only the sum of $4,065.29 of its lien claim for supplies furnished the Roanoke Iron Company, duly filed in the clerk's office of the hustings court of Roanoke city, amounting to $6,060.94. The master reports as a supply lien only so much of said account as falls within the period of 90 days before the filing of the claim in the clerk's office. The claimant, the mining company, contends that its claim was an open, running account, from the 9th day of May to the 6th day of December, 1894, the whole of which should be embraced in its lien secured by filing the account. That its account cannot be severed by the application to each item of the statutory period of 90 days, and excluding all of the account which did not accrue within 90 days prior to filing the lien. Of this account, running from May 9, 1894, to December 6, 1894, the master allows only so much thereof as includes ore furnished between the 18th day of October, 1894, and the 16th day of January, 1895, and excludes all of the account for ore furnished from May 9 to October 18, 1894. The statute provides that the person furnishing supplies shall have a lien if, within 90 days after such supplies are furnished, a memorandum of lien is filed. In this case the supplies were furnished under one contract, the deliveries being from day to day. The items are so connected as to form one transaction. It was a

running account, and the limitation of 90 days must commence at the date of the last delivery of ore. Central Trust Co. v. Chicago, K. & T. Ry. Co., 54 Fed. 598; Chit. Cont. 911; Add. Cont. 1205.

6. The Roanoke Grocery & Milling Company and a number of others claim to be supply lien creditors of the defendant company, and file exceptions to the master's report, on the ground that he has failed to report these claims as constituting liens for supplies furnished. The evidence shows that the Roanoke Iron Company had connected with its iron business, and conducted by the same iron company, a commissary store, to which it frequently gave to its employés, in payment, in part or in whole, of their wages, orders for such goods and supplies as they desired to purchase for their individual use, or for the use of their families; that other persons than employés of the company, if they desired to do so, could and did purchase goods at this commissary store; and that the said Roanoke Iron Company took out a merchant's license under the tax laws of the state of Virginia for the privilege of conducting this store. Counsel for the exceptants insists that the goods sold to the defendant company, for the purpose of supplying this store, are necessary to the operation of the business of the iron company. This claim is asserted under a provision of the Virginia statute which provides that "all persons furnishing supplies to a mining or manufacturing company necessary to the operation of the same shall have a prior lien upon the personal property of such company other than that forming part of its plant for the money due them for such supplies." The language of the statute is "supplies necessary to the operation of the company." It includes such things as contribute directly to carrying on the work in which the company is engaged. The statute does not contemplate that the dry goods and groceries of every kind necessary to carry on a separate, distinct, and licensed mercantile establishment shall be considered supplies necessary to the business of making iron. Such a contention might possibly be sustained in case of a mining or manufacturing company operating in some isolated locality, remote from a town or other place where such supplies can be obtained as are necessary to the existence and comfort of its employés and their families. But no reason of the kind exists in this case, where the company is located within the corporate limits of a flourishing business city, where supplies of every kind are readily accessible to the employés of the company. The connection of the commissary store with many kinds of private corporations is well understood. Its purpose is to enable the corporation to speculate in the wages it contracts to pay its employés, by selling them goods, not at prime cost, but at a profit. Not unfrequently the profits made in this way by the company are greater than those realized from the business in which it is engaged. All of the exceptions to the master's report based on the ground that the goods sold the defendant company were for supplying its commissary store will be overruled.

7. The Mill Creek Coal & Coke Company file an exception to the master's report, on the ground that he failed to report as a supply lien a claim of $15,059.06. The master reports that the affidavit to

the memorandum filed in the clerk's office of the hustings court of the city of Roanoke of this claim was made by C. D. Bray, the chief bookkeeper of said company, and was made in the state of West Virginia before D. F. Kellar, a notary public for Mercer county, in said state; but the affidavit is not verified, as required by section 174 of the Code of Virginia of 1887 where affidavits are made before officers of another state, and it does not constitute a lien against the property of the Roanoke Iron Company. The Virginia statute giving a lien of this character provides that, to be entitled to such lien, the claimant shall, within 90 days after such supplies are furnished, file, in the clerk's office of the county or corporation in which is located the chief office in this state of the company against which the claim is, a memorandum of the amount and consideration of his claim, verified by affidavit, which memorandum the clerk is required to record in the deed book. In this case the affidavit as to the correctness of the claim was made before a notary public in the state of West Virginia, and he certifies under his notarial seal that it was so made. Section 173 of the Code of Virginia provides that an oath of this character may be administered by or made before a justice, notary, or other designated officers. Section 174 of the Code provides that "an affidavit may also be made before any officer of another state or country authorized by its laws to administer an oath, and shall be duly authenticated" if it be subscribed by such officer, and there be annexed to it a certificate of the clerk or other officer of a court of record of such state or country, under an official seal verifying the genuineness of the signature of the first-mentioned officer, and that he has authority to administer an oath. In this case the certificate of the clerk or other officer of a court of record showing that the notary public had authority to administer an oath was not annexed to the affidavit, and the clerk admitted the memorandum to record without such certificate.

It is insisted by counsel who contest the allowance of this claim that the clerk had no authority to admit to record the memorandum of this lien, and that the same is a nullity. Counsel for the Mill Creek Coal & Coke Company contend: That the real question to be decided is, was the affidavit made before an officer authorized to administer an oath? That the question is one of fact, and that the claimant has a right to introduce evidence to show that the person by whom the oath was administered had authority to administer the same. It offers to show this by the certificate of the clerk of the county court of Mercer county, W. Va. The court thinks the claimant has a right to show that the oath was properly administered, and that the omission to have the clerk of the court to certify that the notary was authorized to administer the oath under the laws of West Virginia can be supplied. The contention of counsel for the Mill Creek Coal & Coke Company that this can be done is sustained by the following authorities: Jackman v. Gloucester, 143 Mass.. 380, 9 N. E. 740; Lawton v. Kiel, 51 Barb. 30; Finley v. West, 51 Mo. App. 569; Kruse v. Wilson, 79 Ill. 233. Exception sustained.

The Mill Creek Coal & Coke Company, on the 14th day of January, 1896, filed this same claim, properly authenticated, in the

clerk's office of the hustings court of the city of Roanoke, and counsel contend that if the first claim was not filed so as to create a lien, and if it be a nullity as a lien, the second claim, being properly filed and recorded, is a lien against the property of the defendant company, and should be allowed among the lien debts.   Counsel objecting to the allowance of this lien contend that it was not filed within the 90-days limitation prescribed by the statute.   But counsel for the Mill Creek Coal & Coke Company claim that the order of reference to the master suspended the running of the statutory limitation of 90 days within which the memorandum must be filed in order to secure a lien.   It was so held by this court in Seventh Nat. Bank v. Shenandoah Iron Co., 35 Fed. 443.   The same doctrine was held in the circuit court for the Eastern district of Virginia in Newgass v. Railway Co., 72 Fed. 712.   In this case it was held that the limitation ceased to run at the filing of the general creditors' bill, and the court says that this doctrine is settled beyond controversy for the federal courts by the case of Richmond v. Irons, 121 U. S. 29, 7 Sup. Ct. 788.   In this case Mr. Justice Mathews discusses the question at considerable length, and with his usual ability.   Also, under these decisions, the Mill Creek Coal & Coke Company is entitled to have its lien allowed.

There are a number of exceptions to the master's report, each involving small amounts, which the court will dispose of together:

(1) Exception by Dent & Jackson, because the master allows in his report a supply lien to them of only $2,762.91, whereas they claim the lien should be $2,867.88.   This seems to be a running account for ores furnished to the defendant company, and, under the ruling of the court on the exceptions filed in this cause by the New York & Virginia Mining & Mineral Company, this exception should be sustained.

(2) Exception by R. P. Patterson, manager, and James E. Porter, secretary and treasurer, because the master failed to report their claims as labor claims, and entitled to priority as such.   These claims were properly disallowed as labor claims by the master, these officers not being within the provisions of the statute giving labor claims a priority.   Seventh Nat. Bank v. Shenandoah Iron Co., 35 Fed. 436. Exceptions overruled.

(3) Exceptions by Edward Conway and others, because the master allowed less on their labor claims than was justly due them. These are all running accounts, and the 90-days limitation should be applied at the conclusion of the account.   The provision of the statute is that the claim shall be filed within 90 days after service rendered.   The court holds that, in case of a contract for labor to be performed at so much per day, the statute means by the term "after service rendered" the date when the contract is completed or terminated, and that it does not require, in case of a running contract of this kind, where the work is done from day to day, that the claim shall be severed, and only so much thereof allowed as a lien as falls within the period of 90 days prior to the recordation of the claim.

A decree will be prepared in accordance with these rulings of the court, confirming the master's report except as modified by the court's views.