FRICK CO. v. NORFOLK & O. V. R. CO. et al.

NORFOLK BANK FOR SAVINGS & TRUSTS v. GODWIN et al.

(Circuit Court of Appeals, Fourth Circuit. March 16, 1898.)

Nos. 254 and 255.

1. DOMICILE OF CORPORATION—PRINCIPAL OFFICE.

Where the place of the chief office of a corporation is not designated by its charter, vote of its stockholders, or resolution of its directors, it is where its stockholders and directors usually meet, where it elects its officers, and conducts its financial operations.

2. SAME—CHANGE OF LOCATION.

The general officers of a railroad company cannot, by changing the location of their offices for the more convenient dispatch of business, remove the

principal office of the company from the place at which it has been established by its stockholders and directors.

3. MECHANICS' LIENS—TIME OF FURNISHING MATERIALS—ERECTING ENGINES.

Where a contract for furnishing engines provides for placing them in position and for a 30-days test, the limitation within which a lien therefor may be perfected does not begin to run until they are placed in position, adjusted, and put in operation.

4. SAME—ENGINES NECESSARY TO OPERATION OF RAILROAD.

Engines for the purpose of generating electricity for propelling cars are "engines necessary to the operation" of an electric railroad, within the meaning of Code Va. 1887, § 2485, giving a prior lien to employés and persons furnishing certain supplies to transportation companies.

5. SAME—MATERIALS AND LABOR CLAIMS.

Materials and labor furnished in the erection of car barns, train sheds, power and boiler houses, depots, and workshops, and rebuilding an hotel belonging to a railroad company, are not supplies necessary to the operation of such road, within the meaning of Code Va. 1887, § 2485, giving a prior lien for necessary supplies to transportation companies.

6. SAME—PERFECTING LIEN—LIMITATIONS.

Where materials and labor are furnished to a railroad as they are from time to time ordered, and not in fulfillment of a single contract, the limitation within which a lien therefor may be perfected begins to run against each item at the time it is furnished.

7. SAME—CONTRACTOR OR LABORER—PREFERRED LIEN.

One who lays the track, constructs the overhead line, and strings the feeder wire for an electric railroad at an agreed price per foot or mile is a contractor, and not a laborer, within the meaning of Code Va. 1887, § 2485, giving a prior lien to certain employés and laborers.

Appeals from the Circuit Court of the United States for the Eastern District of Virginia.

Jas. E. Heath, Jas. E. Heath, Jr., and George McIntosh, for appellant Frick Co.

Richard B. Tunstall and F. M. Whitehurst, for appellant Norfolk Bank for Savings & Trusts.

Richard B. Tunstall, for appellees Norfolk & O. V. R. Co. and others.

John B. Jenkins and Robert M. Hughes, for appellees Godwin and others.

Before SIMONTON, Circuit Judge, and JACKSON and PAUL, District Judges.

PAUL, District Judge. These causes are here on appeals by the Frick Company, the receivers of the Pottsville Iron & Steel Company, White & Dodson, and Frank R. May, appellants in No. 254, against Norfolk & Ocean View Railroad Company and others, appellees, and by the Norfolk Bank for Savings & Trusts, trustee, appellant in No. 255, against T. W. Godwin & Co. and G. S. W. Brubaker, appellees, from a decree of the circuit court for the Eastern district of Virginia rendered in the cause of the Walker Manufacturing Company against the Norfolk & Ocean View Railroad Company and others. As they are here on appeals from the same decree, they will be considered together.

The suit in the circuit court was brought by the Walker Manufacturing Company to enforce a lien claimed by it upon the franchises, gross earnings, and all the real and personal property of the Nor-

folk & Ocean View Railroad Company. A receiver was appointed
in said suit to take charge of the property of the said railroad company,
and the cause was referred to a master to take an account of the debts
and liabilities of the said railroad company, the liens on its property,
and their priorities. The appellant in No. 254 and the appellees in
No. 255 severally filed their petitions of intervention in said cause,
praying to be made parties therein, and claiming that they were sup-
ply lien creditors of said railroad company under the provisions of
Code Va. 1887, §§ 2485, 2486.

Section 2485, Code Va. 1887, is as follows:

"Sec. 2485. All conductors, brakesmen, engine-drivers, firemen, captains, stew-
ards, pilots, clerks, depot or office agents, store-keepers, mechanics, or laborers,
and all persons furnishing railroad iron, engines, cars, fuel, and all other sup-
plies necessary to the operation of any railway, canal or other transportation
company * * * shall have a prior lien on the franchises, gross earnings,
and all the real and personal property of said company, which is used in oper-
ating the same, to the extent of the moneys due them by said company for such
wages or supplies. * * *"

The mode of perfecting such lien is prescribed by section 2486,
Code Va. 1887, as amended by the act of assembly of February 15,
1892, which is as follows:

"Sec. 2486. No person shall be entitled to the lien given by the preceding sec-
tion unless he shall, within ninety days after such supplies are furnished or
services rendered, file in the clerk's office of the court of the county or corpora-
tion in which is located the chief office in this state of the company against
which the claim is * * * a memorandum of the amount and consideration
of his claim verified by affidavit, which memorandum the said clerk shall forth-
with record in the deed-book and index the same in the name of the said claimant,
and also in the name of the company against which the claim is. Any such
claim may be enforced in a court of equity." Laws 1891-92, p. 362.

The grounds of exception to the master's report, and the assignment
of error in each of the cases brought up by the appellants, present
questions sufficiently different from those raised by the others to re-
quire a separate examination and discussion of the merits of each claim
upon which appeal was taken from the decree of the circuit court.
There is, however, one general ground of exception to the findings
of the master which the circuit court overruled, applicable alike to
nearly all of these claims. The statute (section 2486, Code Va. 1887,
as amended) provides that "no person shall be entitled to the lien
given by the preceding section unless he shall, within ninety days
after such supplies are furnished or service rendered, file in the clerk's
office of the court of the county or corporation in which is located
the chief office in this state of the company against which the said
claim is * * * a memorandum of the amount and consideration
of his said claim verified by affidavit. * * *" The claims of the
appellants in No. 254 were filed in the clerk's office of the corporation
court of the city of Norfolk. The claims of the appellees in No. 255
were filed in both the clerk's office of the corporation court of the
city of Norfolk and in the clerk's office of the county court of Norfolk
county. The master reported that the claims of the appellants in No.
254 were not filed in the proper office; that the chief office of the
Norfolk & Ocean View Railroad Company was not in the city of

Norfolk, but at Ocean View, in the county of Norfolk; and that the claims, in order to become liens under the statute, should have been filed in the clerk's office of the county court of Norfolk county.

The original charter of the Norfolk & Ocean View Railroad Company, which incorporated the said company as the Norfolk & Ocean View Railroad & Hotel Company, fixed no place at which the company should have its chief office in this state. Nor did the amended charter, which changed the name of the company to the Norfolk & Ocean View Railroad Company, designate the place of its chief office. It was, therefore, left for the stockholders or board of directors to locate the chief office of the company. The company was originally incorporated February 27, 1879, and the evidence shows that from that time until it went into the hands of a receiver, on the 21st day of February, 1896, the meetings of its stockholders and directors were held in the city of Norfolk. It is conceded that its chief office was in the city of Norfolk until September, 1895. But the record shows that the stockholders continued to hold their meetings in the city of Norfolk until February 19, 1896. In pursuance of an act of the general assembly of Virginia (Acts 1891-92, p. 428), railroad companies are required to report annually to the auditor of public accounts, among other things, the county or corporation in which the principal office of such company is located. In June, 1895, the defendant company reported its chief office at Norfolk. This is the place at which, as the evidence shows, it had been since 1879. It had up a sign at 16 Bank street, in the city of Norfolk, and the directory of Norfolk showed the chief office of the company to be located in that city. In September, 1895, some of the officials of the railroad company moved their business offices to Ocean View, and in June, 1896, the receiver reported the chief office of the company as being at Ocean View. Such removal was done without the direction or approval of the stockholders or directors. No notice was given to the public or to these lien creditors by the directors, or by any one else authorized to make or approve the change, that the chief office of the company had been removed from Norfolk city to Ocean View.

The location of the principal office of a corporation is an important matter in Virginia, affecting, as it does, the jurisdiction of her courts, service of process, and other legal proceedings. Code Va. 1887, §§ 3214, 3227. To change the place of its principal office without due notice to the public and by competent authority may work serious detriment to persons having important business relations with the corporation. How grave these consequences may be this case abundantly shows, where liens of creditors amounting to thousands of dollars are sought to be defeated because they are, it is claimed, not recorded in the clerk's office of the county or corporation where the railroad company had its chief office. To say that the general officers of a railroad company, who find it convenient for the dispatch of business to change their location to some other point on the line, can thereby change the location of the principal office of the company from the place at which it has been established by the stockholders and directors, would be to invest the ministerial officers of a

corporation with an authority they do not possess.     If such power as this can be conceded to the general officers of a corporation, then the chief office of a corporation, instead of having the permanent location and fixed character contemplated by the law, might be the subject of such frequent changes as to lead to great inconvenience, irregularity, confusion, and injustice.     The charter of the railroad company failing to designate the place of the chief office, and no place being designated by vote of the stockholders or resolution of the directors, the place of the chief office can be implied and established from the acts of the stockholders and directors.     The place of the principal office of a corporation is where its stockholders and directors usually meet, where it elects its officers and conducts its financial operations.     The record in this case shows that the railroad company held the meetings of its stockholders and directors in the city of Norfolk from its organization to the time it was placed in the hands of a receiver.     No meeting of the stockholders or directors was ever held at Ocean View.     On the 17th of December, 1895, more than three months after, it is alleged, the principal office was removed to Ocean View, the stockholders held a meeting in Norfolk at which directors of the company were elected to hold office until June 1, 1896. The directors were, at that meeting, authorized to increase the capital stock of the company from $50,000 to $200,000, and to increase the bonded debt from $300,000 to an amount not exceeding $500,000. Various adjourned meetings of the stockholders were held between this date and the appointment of a receiver, all of which were held at Norfolk.     At one of these meetings, held February 11, 1896, an amendment to the charter of the company by an act of the legislature of Virginia, changing the name of the company to the Norfolk & Ocean View Railroad Company, was accepted, and the officers of the company were directed to give proper notice thereof to all persons doing business with the company.     The secretary was authorized to issue $50,000 of new stock, and to call in $50,000 of the old stock, to procure a new book, seal, etc., for the company, and to cancel the old stock taken in.     These facts establish unquestionably the place of the principal office of the company to have been at Norfolk after the several administrative offices had been removed to Ocean View.

The case of Coal Co. v. Haslett (Ga.) 10 S. E. 435, was an action for damages brought by the defendant in error in the city court of Atlanta, the city being in Fulton county, Ga.     The act incorporating the coal company did not designate any place where its principal office should be.     The defendant below filed a plea in abatement to the effect that the Dade Coal Company was located in the county of Dade, the plea stating:

"All of the defendant's coal-mining operations are located in Dade county, and all of its books relating to the shipment of the product of its coal mines are kept in Dade county, at its offices at the said Dade coal mines, at a place known as 'Coal City'; its superintendent and agents having charge of its coal-mining operations are also at its said mines at said Coal City, and all of its mining operations are carried on in said county of Dade; its office in Atlanta is for the purpose of electing its officers and for the purpose of conducting its financial operations."

The court sustained the demurrer to this plea, holding that:

"Upon the face of the plea itself, the proper court in Fulton county had jurisdiction of the case, inasmuch as the plea showed affirmatively that it had an office in Atlanta for the purpose of electing its officers and for the purpose of conducting its financial operations. The act of the legislature incorporating this company approved February 21, 1873, does not by any of its provisions locate this company in any particular county of this state. It can carry on its mining operations in any county by the terms of the act. The company, therefore, had a right to establish its principal place of business in any county in this state; and the company having chosen to locate its office in Atlanta, 'for the purpose of electing its officers and for the purpose of conducting its financial operations,' we think that gave the proper court in Fulton county jurisdiction in this case, and there was no error in sustaining the demurrer to this plea."

In Jossey v. Railway Co., 28 S. E. 273, the supreme court of Georgia says:

"The business of a railroad corporation, because of its nature, must of necessity be conducted in places other than that fixed by its charter as the place of location of its principal office. While the latter place must be the point at which the corporation as a corporate entity resides, it is indispensable to its business that it shall be enabled elsewhere to establish offices of a purely administrative character; and a distinction must be taken between the principal office of a corporation and these administrative offices which may from time to time be created by the corporation for the more convenient transaction of the business for the conduct of which it was created. It must have a place at which it may be sued, at which its corporate functions may be performed; but this does not negative the right to establish other places for the transaction of the industrial business of the corporation."

These decisions are in consonance with the provisions of the Virginia statutes, fixing the place where suits may be brought against, and process served upon, a corporation, and the statute requiring railroad companies to report to the auditor of public accounts the place of its principal office. We are of opinion that, under the evidence in this cause, the circuit court erred in finding that the principal office of the Norfolk & Ocean View Railroad Company was at Ocean View, in Norfolk county, and not in the city of Norfolk. The claims which were filed in the corporation court of the city of Norfolk were properly filed.

We will consider the errors assigned by the several appellants to the action of the circuit court in disallowing their respective claims as constituting liens on the franchises, gross earnings, and real and personal property of the defendant railroad company superior to the lien of the mortgage bondholders:

First. The claim of the Frick Company: Prior to the month of April, 1895, the Norfolk & Ocean View Railroad & Hotel Company, now the Norfolk & Ocean View Railroad Company, operated, by steam, a narrow-gauge railroad from Norfolk to Ocean View, a distance of about nine miles. Its stockholders and directors determined to change the track of said railroad from a narrow-gauge road operated by steam to a broad-gauge road operated by electricity. In pursuance of this purpose, it is alleged, the railroad company contracted with the Philadelphia Construction Company to construct a portion of its electric road and to furnish it two engines. The construction company applied to the Frick Company

to furnish these engines.    The Frick Company, on the 22d day of March, 1895, made a proposal to the Philadelphia Construction Company to sell two of its tandem compound engines, and on the 1st day of April, 1895, the Philadelphia Construction Company accepted the proposal.    The provisions of this contract, material to this discussion, were as follows:

"Engines to be delivered by us (Frick Co.) f. o. b. cars at Norfolk, Va., freight to power house to be paid by Frick Company.    Trucking and expense of placing on foundation to be borne by Frick Company.    We (Frick Co.) will furnish the services of one competent mechanic to superintend and assist in the erection of above machinery, board and traveling expenses of our (Frick Co.) mechanic to and from Waynesboro, Pa., to be paid by Frick Company.    All extra expense caused Frick Company by failure on the part of purchaser to make preparations to receive this machinery, delays caused by not promptly furnishing foundations, suitable assistance and common labor,  *  *  *  the purchaser is to pay such extra expense occasioned Frick Company, and the payment for machinery as agreed below not to be deferred by reason of said failure on the part of purchaser, but the same to be paid promptly as in case of no delay. We agree to ship from our works first engine in 45 days after execution of this contract, and second engine in 55 days.    Price to be, f. o. b. cars at power house, Norfolk, Va., as above specified, $11,164.00, net cash.    Payments to be made on receipt of machinery, $5,582.00 by note at 60 days, with interest, and balance after 30 days' trial by note for $5,582.00, at 60 days, with interest. Notes indorsed to satisfaction of Frick Company."    "If notes are given for balance, same to be indorsed or secured and made payable in bank, bearing interest from date of delivery of machinery."

The Frick Company's proposal contained this provision:

"All contracts are subject to acceptance and approval by the Frick Company's executive board."

So far as the record shows, there was no further correspondence between the Frick Company and the construction company.    Reinhardt, the president of the Frick Company, testifies that it was some time after the order was taken by their agent, Holt, before the same was finally accepted.    He says: "We did not accept it at all until we had the assurance of the Norfolk and Ocean View Railroad Company, and to indorse the notes, and these engines were furnished according to the contract."    Further, in answer to this question by counsel for the defendant railroad company: "Q. I would ask you how the Norfolk and Ocean View Railroad Company ratified the contract with the Philadelphia Construction Company,"—he said: "They ratified it with that letter and a verbal promise.    They agreed to indorse the notes there, and then after we got that letter we accepted the order."    The letter referred to is as follows:

"Executive Offices of the Norfolk & Ocean View Railroad and Hotel Company,
633–635 Drexel Building.
"Philadelphia, Pa., April 16, 1895.

"The Frick Co., Waynesboro, Pa.—Dear Sirs:    In regard to the recent inquiry of your president in regard to indorsements of the notes which are to be given in payment for the tandem compound engines you are building for the Norfolk & Ocean View. I beg leave to say that, if you desire, these notes will be indorsed by the railroad company to whom you are furnishing the engines.    Hoping this is satisfactory, that there will be no delay in the delivery, I am,
"Yours, very truly,                Norfolk & Ocean View R. R. Co.,
"Charles H. Barritt, President."

After the receipt of this letter, the Frick Company proceeded with the execution of its contract, delivered the engines to the Norfolk

& Ocean View Railroad Company, and placed the same on foundation. The railroad company indorsed one note for the construction company for $5,582, which was delivered to the Frick Company. This note went to protest. The other note for $5,582, stipulated for in the proposal, was not given.

The construction company has filed no claim against the railroad company for the engines, and there is nothing in the record to show that it has been paid for them. From the energy with which the trustee of the railroad company resists the allowance of this claim as a lien, but takes no exception to its allowance as a general debt, we must conclude that the railroad company did not pay the construction company for these engines.

Much light is thrown upon the intimate relations between the railroad company and the construction company by the record. It shows that the construction company and the executive board of the railroad company occupied the same room in the Drexel building in Philadelphia as the office of both. It further shows that the Pottsville Iron & Steel Company of Pottsville, Pa., sold to this same construction company in May, 1895, certain trusses and purlins for the car barn of the Norfolk & Ocean View Railroad Company. This purchase was made by the construction company through one A. Langstaff Johnston, whom the construction company terms "our engineer." About the same time the railroad company itself made two contracts for the purchase of materials of various kinds of the Pottsville Iron & Steel Company through the agency of the same person, Johnston, whom the president of the railroad company styles "our Mr. A. Langstaff Johnston." It is apparent from this examination of the record that the Norfolk & Ocean View Railroad Company was the real purchaser of these materials, and that in these transactions the construction company was making the purchases through its agent, Johnston, for the railroad company. These transactions, it will be observed, were nearly contemporaneous with the purchase of the Frick engines, and it is apparent that the purchase of the Frick engines was made in the same way; that the railroad company, the beneficiary in the contract, was the substantial purchaser; that credit was given by the Frick Company to the railroad company; and that the Frick Company looked to the railroad company for payment. The railroad company clearly regarded the contract in the same way when its president wrote the letter of April 16, 1895, wherein he said: "The notes, if you desire it, will be indorsed by the railroad company to whom you are furnishing the engines."

The master was correct in allowing the whole of the Frick Company's claim as a debt against the railroad company, and there was no exception taken to his so allowing it. It remains to be considered whether he was right in classing the Frick Company among the general creditors, or whether the claim should have been reported as a lien for supplies furnished for the operation of the railroad, and as such having priority over the mortgage bonds. He assigns as a reason for refusing to report this claim as a lien that it was not filed within 90 days after the supplies were

furnished. The claim was filed in the clerk's office of the corporation court of Norfolk city on the 15th day of January, 1896. The contract provided that trucking and placing the engines on foundation should be at the expense of the Frick Company, and that it should furnish one competent mechanic to superintend and assist in the erection of the machinery; the board and traveling expenses of the mechanic from and to Waynesboro, Pa., to be paid by the Frick Company. All extra expenses caused the Frick Company by the failure of the purchaser to receive the machinery, by delay to promptly furnish foundation, suitable assistance, common labor, etc., was to be paid by the purchaser. It also provided for a 30-days trial of the engines by the Norfolk & Ocean View Railroad Company. The engines arrived at Norfolk in the month of July, 1895. In the month of September following the Frick Company sent its mechanic to Norfolk to finish up and start the machinery, but, the railroad company not being ready for this work, the mechanic returned to Waynesboro, Pa., and came again the last of October, 1895, and the work necessary to start the engines was completed on the 5th day of November, 1895. Counsel for the appellee, the trustee, insist that the 90 days within which the appellant the Frick Company could file its claim should begin to run in July, 1895, when the engines arrived at Norfolk. Counsel for the Frick Company contend that the 90-days limitation did not begin to run until the 5th day of November, 1895; that the engines were not fully erected, the connections adjusted, and the machinery put in operation until that date; and that this is the date at which, in the language of the statute, they were furnished. Besides, they contend that, as the railroad company had 30 days in which to test the engines after they were put up, the Frick Company may reasonably contend that the 90-days limitation did not commence to run until the expiration of the 30 days allowed for testing after the engines were put up.

We think the engines were not furnished to the railroad company, at least, until they were placed in position, adjusted, and put in operation. This was on the 5th day of November, 1895, within the statutory limitation, and it is not necessary to discuss the effect of the provision in the contract for a testing period of 30 days. The claim was duly filed.

The remaining objection raised before the master to the allowance of this claim as a lien prior to the mortgage bonds is that it is not for supplies necessary to the operation of the railroad. The statute gives a prior lien to all persons furnishing "railroad iron, engines, and all other supplies necessary to the operation of any railroad, canal, or other transportation company." This is without question a railway company, and the fact that the motive power used is electricity, instead of steam, as was the case before the road was changed from a narrow-gauge to a broad-gauge track, does not of itself bar this claim from the benefit of the statutory provision for giving a prior lien to the claims of persons furnishing supplies necessary to the operation of the road. The contention that the engines for which a lien is given by the statute are only such as are

used on a railroad where the trains are drawn by steam power is without merit. These engines are for the purpose of generating electricity, which is the propelling power on the electric railway, as the steam engine furnishes the propelling power on the ordinary railroad. The statute does not limit the lien given to the vendor to locomotive engines used in propelling cars by steam. The language of the statute is: "Engines * * * necessary to the operation of any railway, canal, or other transportation company." It embraces engines that may be used by steam railroads, steamboats, canalboats, electric railways, or by any other kind of transportation companies. These engines are not, as further contended, a part of the permanent construction of the railway, and therefore not embraced within the supply lien law. Though they are stationary, yet they are indispensable to create the force that propels the cars, and they are clearly "engines * * * necessary to the operation of the road."

Second. The receivers of the Pottsville Iron & Steel Company, petitioners, appeal from the decision of the circuit court, and assign as error the failure of that court to allow its claim a prior lien for supplies to the Norfolk & Ocean View Railroad Company necessary to its operation. This claim is for trusses and purlins for car barn, for anchor bolts for train sheds, for erecting trusses and purlins for power and boiler houses, for erecting crane, and for furnishing and erecting trusses for workshop, and for steel columns for car depot and workshop. These are supplies and labor furnished for the construction of permanent buildings which are properly part of the railway plant. These buildings are not in themselves supplies necessary to the operation of the railway. They are buildings erected for the protection and preservation of the cars, engines, and other machinery, just as roundhouses and car sheds are used by steam railroads for the protection and preservation of their locomotives and coaches. Their character as property is distinct from that of necessary supplies as defined by section 2485, Code Va. 1887. And there is no error in the holding of the circuit court as to this claim.

Third. The appellant Frank R. May assigns as error the refusal of the circuit court to sustain an exception filed by him to the report of the master. The exception overruled by the circuit court was taken on the ground that the appellant's claim was due for supplies, and should have been reported as constituting a lien on the franchise, gross earnings, and real and personal property of the railroad company. The record shows that this claim is for rebuilding an hotel belonging to the railroad company. The first item of the account is, "To amount contract for rebuilding hotel, $11,500.00." The other items are for extra work done in connection with the hotel as directed by the architect and superintendent, and as agreed by the president of the railroad company. This hotel may be a very desirable adjunct to the railroad as affording accommodations for its passengers and for persons seeking Ocean View as a seaside resort, but the purposes for which it is used make it such a distinct piece of property that it cannot be confounded with the rail-

road proper in such way as to bring the cost of its construction, repair, and furnishing under the head of labor and supplies necessary to the operation of the railroad, giving it a prior lien as such. The decision of the circuit court was correct.

In case No. 255 the appellees Godwin & Co. claimed a lien for labor and supplies furnished to the railroad company necessary to its operation. Their account commenced July 1, 1895, and ended February 10, 1896. Godwin & Co. were manufacturers and repairers of machinery, and their account is for labor of their smiths and machinists for repairs made from time to time to the machinery of the railroad company, and for materials used in such work. The master in his report allowed as a lien so much of the account, $270.79, as accrued within 90 days before the ending of the account. To this finding of the master Godwin & Co. excepted on the ground that they were entitled to a lien for the full amount of their claim, $1,674.24, as it was for supplies and labor furnished on a continuing contract and running account, and that the statutory limitation of 90 days for recordation of their claim did not begin to run until the 10th day of February, 1896, that being the date at which the last of the supplies and labor was furnished. The circuit court sustained the exception, and allowed the whole account as a prior lien for supplies and labor. From this decision of the circuit court the Norfolk Bank for Savings & Trusts, trustee, appealed, assigning as error that:

"The court erred in that it sustained the exceptions of T. W. Godwin & Co. to the report of Special Master W. L. Williams, which was filed November 14, 1896; and in that it adjudged that the said T. W. Godwin & Co. was entitled to a supply lien for $1,645.24, and interest from February 10, 1896, upon the franchises, gross earnings, and all the real and personal property of the Norfolk & Ocean View Railroad Company, prior to the lien of the holders of the bonds secured by the deed of trust made by the said defendant railroad company and dated May 1, 1895."

For Godwin & Co. it is contended that their account from July 1, 1895, to February 10, 1896, was a continuous, running account, and that the limitation of 90 days within which the same is required by the statute to be recorded in order to perfect the lien as a prior lien did not begin to run until the last charge in the account. The case of Fidelity Insurance Trust & Safe-Deposit Co. v. Roanoke Iron Co., 81 Fed. 439, decided by the circuit court for the Western district of Virginia, is cited as sustaining this contention. In that case the court, construing section 2485 of the Code of Virginia of 1887, held that where supplies are furnished under one contract, the deliveries being from day to day, the items are so connected as to form one transaction, and the limitation of 90 days must commence at the date of the last delivery. In that case there was a single contract for the sale of a quantity of iron ore at a fixed price per ton, and the deliveries were from day to day, or at other short intervals.

In Central Trust Co. v. Chicago K. & T. Ry. Co., 54 Fed. 598, the court, construing a Missouri statute similar to the Virginia statute, said:

"If the materials were furnished under a single contract, and were in fulfillment thereof, the items of the account would be continuous, and the material man would have ninety days from the date of the last item within which to file his account and perfect his lien. * * * On the other hand, if the several items of the account, or a portion of them, are furnished under separate. contracts, then the lien should have been filed ninety days from the date of the last item under each independent contract."

Applying this doctrine to the account of Godwin & Co., the claim that the limitation of 90 days must be applied to the date of the delivery of the last item cannot be sustained. The account as filed is due to the Virginia Iron Works, another firm name under which the members of the firm of Godwin & Co. conducted business, and a great number of the charges are for work done, generally, by the hour, by the machinists, smiths, carpenters, and laborers of the Virginia Iron Works, in repairing the trucks, car wheels, axles, bond rails, etc., of the railroad company. A number of the charges are for drayage, and a large number for bolts, castings, small lots of iron, steel, etc., for repairs. The work and material were not embraced in a single contract; and an inspection of the account shows that, from the diversity of the character of the services rendered and the supplies furnished, they could not have been contemplated and estimated for in advance, so as to include them in a single contract at a fixed price. That they were not embraced in a single contract, but were furnished on separate and distinct orders, is clearly established by the evidence. One of the partners of the firm, A. L. Woodworth, testifies as follows:

"By Mr. Jenkins (attorney for Godwin & Co.): Q. Were all of the labor, supplies, and material furnished there necessary for the operation of the road? A. Yes, sir. Q. And none for new construction? A. None. Every item was for repairs. Cross-examination by Mr. Tunstall (attorney for the trustees): Q. You mean for operating supplies? A. Yes, sir; current requisites for the operation of the road. They were current repairs. Q. Was there any general contract for the whole thing? A. None. Q. You just furnished things as they ordered them from time to time? A. We furnished labor and material for repairs as they ordered them. Q. And the labor and material furnished were on these dates? A. Yes, sir."

The evidence not only fails to show that the labor and materials were furnished under a single continuing contract, but completely refutes that contention. In our judgment, the master was correct in applying the statutory limitation at a date 90 days before the last item of the account was furnished, and the circuit court erred in holding that the limitation began to run at the date of the charge of the last item in the account.

The second question for our consideration in case No. 255 is that arising on the claim of the appellee G. S. W. Brubaker. This claimant, in his memorandum of his claim filed in the clerk's office, stated that the amount claimed was due him by the railroad company "for labor and work done and furnished for and about the erection of trolley poles and wires, the laying of the tracks, and the grading of the roadbed of said company, in the county of Norfolk and in the city of Norfolk, Virginia, for the purpose of adapting the said railroad for standard-gauge service, and to the use of electricity as a motive power in the operation of the said road, and of furnishing electric power for

the operation thereof." The railroad company furnished all the materials, and Brubaker agreed to furnish all his own tools and labor for the work he undertook to do, at the following prices:

"(a) Lay the track and place in complete order ready for operation for the sum of thirty (30) cents per lineal foot of track. Special work, double price. (b) Bond the track with Johnson rail bonds for the sum of one hundred and twenty-five ($125) per mile of track. (c) Construct the overhead line according to the specifications for the sum of three hundred and ninety-five ($395) dollars per mile of trolley. (d) String the necessary feeder wire for the sum of sixty dollars ($60) per mile."

The master refused to report the claim as a lien for labor, stating his reason therefor as follows:

"This is the claim of a general contractor for building a new electric road, and I do not think it comes within the purview of the supply lien law. The legislature of Virginia, at its last session, thought it necessary to provide a lien for such cases as this, and gave a mechanic's lien on railroad beds and tracks."

To this report Brubaker excepted. The circuit court sustained the exception, and allowed the claim as a supply lien. From this holding of the circuit court the Norfolk Bank for Savings & Trusts, trustee for the bondholders, took this appeal. Of the assignments of error it will be necessary for us to consider only the following:

"The court erred in that it sustained the exceptions of G. S. W. Brubaker to the report of Special Master W. L. Williams, which was filed November 14, 1896, and in that it adjudged that the said G. S. W. Brubaker was entitled to a supply lien for $6,056.26, and interest from September 3, 1895, upon the franchises, gross earnings, and all the real and personal property of the Norfolk & Ocean View Railroad Company prior to the lien of the holders of the bonds secured by the deed of trust made by the said defendant railroad company, and dated May 1, 1895."

The Virginia statute (section 2485, Code 1887) designated the employés to whom the statute gives a prior lien on the franchises, gross earnings, and real and personal property of a railroad, canal, or other transportation company. The list includes conductors, brakesmen, engine drivers, firemen, captains, stewards, pilots, depot or office agents, storekeepers, mechanics or laborers, and all persons furnishing railroad iron, engines, cars, fuel, and all other supplies necessary to the operation of any railway, canal, or other transportation company. Contractors are not embraced in this list. It is therefore sought to bring this claim for work and labor done within the class designated as laborers. A question very similar to this arose under an Indiana statute which gave a first and prior lien on the corporate property and on its earnings of any corporation doing business in that state to its employes for all work and labor done and performed by them for the corporation from the date of their employment. One Vane made a contract with a telegraph company to put up six additional wires between certain designated points on and along the telegraph poles owned by the company; to attach such wires to the proper fixtures and appendages to the poles,—the company agreeing to pay him $45 per mile for the wires put and strung upon the poles, the company agreeing to furnish all the wire and other necessary materials. Vane filed his claim under the statute, and sought to enforce the same against the property of the telegraph company, claiming a statutory

86 F.—47

lien thereon as an employé of the corporation. The claim was resisted by the receivers of the company on the ground that Vane did not occupy in his transactions with the telegraph company the relation of an employé, but that of a general contractor. The circuit court for the district of Indiana held that Vane was not an employé of the telegraph company. Woods, J., delivering the opinion, said:

"To be entitled to the benefit of this statute, and of others of like character since enacted, I .think it clear that the employé must have been a servant, bound in some degree at least to the duties of a servant, and not, like the petitioner, a mere contractor, bound to produce or cause to be produced a certain result of labor, to be sure, but free to dispose of his own time and personal efforts, according to his pleasure, without responsibility to the other party." Bankers' & Merchants' Tel. Co. of Indiana v. Bankers' & Merchants' Tel. Co. of New York, 27 Fed. 536.

On appeal, the supreme court sustained the circuit court. It said: "It seems clear to us that Vane was a contractor with the company, and not an employé, within the meaning of the statute,"—and quoted the language of the circuit judge above quoted as expressive of its own views. Vane v. Newcombe, 132 U. S. 220, 10 Sup. Ct. 60.

In Railroad Co. v. Wilson, 138 U. S. 501, 11 Sup. Ct. 405, the court said:

"The terms 'officers' and 'employés' both alike refer to those in regular and continued service. Within the ordinary acceptation of the terms, one who is engaged to render service in a particular transaction is neither an officer nor an employé. They imply continuity of service and exclude those employed for a single transaction."

It cannot be successfully contended that the term "laborer" is more comprehensive than the term "employé," or that the former includes a more extensive class of services than the latter. The provisions of the statute as to persons to whom labor liens are given are clear and explicit. There is no necessity, as urged by counsel for the appellee, to resort to other provisions of the Code to explain them and to give them a more extended application.

We are of opinion that Brubaker was a contractor with the railroad company, and not a laborer, within the meaning of the statute, and his claim cannot be classed as a supply lien under the provisions of section 2485 of the Code of Virginia of 1887, and the circuit court erred in holding it as constituting such a lien.

We affirm the decree of the circuit court in cause No. 254, in holding that the claim of the appellants the receivers of the Pottsville Iron & Steel Company, of Frank R. May, and of White & Dodson are not supply liens. We reverse it as to its holding that the principal office of the Norfolk & Ocean View Railroad Company was at Ocean View, and not at the city of Norfolk, and as to finding that the claim of the Frick Company was not a supply lien. We reverse said decree as to its finding that Godwin & Co. and G. S. W. Brubaker, appellees in case No. 255, are entitled to supply liens for their respective claims. And these causes are remanded to the circuit court, with instructions to amend the decree in conformity to this opinion.