(48 App. Div. 395.)

### PEOPLE ex rel. L. E. WATERMAN CO. v. MORGAN.

(Supreme Court, Appellate Division, Third Department. March 7, 1900.)

CORPORATIONS—TAXATION—EXEMPTIONS.
 A corporation which purchases rubber holders and gold pens from different sources, and by means of skilled workmen and intricate machinery manufactures them into fountain pens, which process of manufacture is protected by patents, is a manufacturing corporation, and exempt from taxation on its capital stock.

Certiorari by the L. E. Waterman Company against William J. Morgan, as comptroller of the state of New York, to recover assessment of tax. Assessment annulled.

The proceedings to assess the tax were commenced prior to May, 1899. The assessment was made about June 30, 1899. A rehearing on application of the relator was had July 24, 1899. The writ of certiorari was directed to issue October 14, 1899.

Argued before PARKER, P. J., and HERRICK, MERWIN, SMITH, and KELLOGG, JJ.

Logan, Demond & Harby (Fred C. Hanford, of counsel), for relator.
John C. Davies, Atty. Gen. (John H. Coyne, Dep. Atty. Gen., of counsel), for respondent.

KELLOGG, J. Two questions are here for determination: Is the relator a manufacturing corporation, and entitled to exemption

from the tax upon its capital stock, as the statute provides? If not exempt from such taxation, is the six-year limitation fixed by section 382 of the Code applicable in this case?

As to the first question: The evidence taken before the comptroller is not conflicting; it is the testimony of the president of the corporation; it is full and undisputed; and whether or not the relator is a manufacturing corporation, such as is entitled to exemption from tax upon its capital stock, must be judged from that. Briefly stated, this is the evidence: The relator is a domestic corporation, and has been in existence since 1887. Its corporate powers are limited to the manufacture and sale of the so-called "fountain pen." Since its organization it has engaged in no business other than the manufacture and sale of a patented article known to the trade as the "L. E. Waterman Fountain Pen," or the "Ideal Fountain Pen." The relator is the exclusive owner of letters patent which give it the exclusive right to manufacture and put upon the market this specific article. It is materially different in construction from the fountain pens of other manufacturers, and the difference lies in the proper adjustment of the pen and feed. This is the most important factor in the construction of a serviceable fountain pen, and this is the thing patented. This is the work by way of manufacturing which the relator does, and this work creates an integral fountain pen which is four times more valuable than the parts purchased by the relator. The relator has always had its factory and done its manufacturing in the city of New York, and none of it elsewhere. It has 30 or 40 people in its employ in this business, and some skilled workmen, and the work done in the construction of the relator's fountain pen is stated by the witness as follows:

"These partially made holders are brought to our place in New York, and none are sold or used anywhere else until after they have passed through our hands. We employ several so-called 'gold-pen shops' to make gold pens for us according to our specifications and instructions and supervision. * * * These pens are only partially ready for use when brought to our place at 157 Broadway, where they are finished by us before they are put into the holders. The holder is also molded and shaped to fit the pens, to make the completed product, and there are three special things that we have to do with each gold pen. Gold pens are made with what we call a set of nibs. * * * The two nibs are made so that, if one is lifted, the other springs under it. * * * In using them for our fountain pen, we have to take out this set. We have never been able to get it done in any of the shops where we have gold pens made partially for us. So we have to employ our own men to do that work. After the pens are reset with the proper set of the fountain pens, they are taken and placed with the feed in the fountain holder; each gold pen being shaped more or less by hand in the process of construction. * * * We have to fit every holder by mechanical means to the feed bar of every holder of the pen. This is done by our workmen, who melt that bar by a spirit lamp or gas jet, and shaping it to the pen and keeping it in that form. This is very important, because the feeding of these fountain pens is by capillary action, and we can only get a proper feeding by having a proper fitting of the feed and gold pen together, to produce a proper capillary action between the three servers which are adjacent to each other. This is so important that we never think of furnishing these parts to people anywhere to be used in repairing our pens. If, in fitting this feed to the inside of the pen, it is pressed up hard against the pen, and holds there, it opens the nibs of the pen, so that they will write. On the other hand, if it is not pressed close enough to fit the pen properly,

there will be a space there, and such pens are unsatisfactory. * * * In making these fittings, they are always examined with a microscope. After the workman has passed them, they go to another workman, who again inspects them, and then examines the pens."

At another place the witness says, in describing the feeding arrangement:

"A piece which helps to hold the gold pen in the holder, and the tongue of which is on the inside of the gold pen, contains a groove that leads from the ink reservoir at the upper end to the nibs of the pen. In that groove are three fissures, or capillary servers or conductors, that carry the ink from the reservoir to the nibs of the pen. The two patents cover this feeding arrangement. * * * He takes a spirit lamp, or a gas jet, and warms the holder until he has got it exactly the right temperature, which is very important. If he gets it too hot, or doesn't get it hot enough, it will not retain the shape into which he melts it. When it is of the right temperature, so it can be molded to fit the pen, he presses it up there, and holds it there until it cools. * * * This makes a continuous capillary conductor along the surface of the pen which is uniform in breadth. If the space between the surface of the pen and the feed bar was irregular in form, it would not hold and conduct the ink properly to make a good fountain pen; and that is absolutely necessary. We have two tried and skilled workmen for this, and everything goes through their hands. * * * After this is done, the nibs of the pen have to be again examined, to see if the shaping and molding and fitting have not spoiled their adjustment. If so, the work has to be done over again. * * * That is the especial point of the fountain pen,—the feeding of the ink properly from the reservoir up to the nibs of the pen, so that we can use the pen, and have an absolute automatic flow. * * * We have put in pen lathes and polishing machines, and electric power to run them, in our place of business, to do some of the details of manufacturing and repairing. * * * It is very elaborate machinery."

Again, the witness says:

"None of the fountain pens are sold that are not completed at our factory by special work by our workmen, and at that place. There are secrets and details of our work which no other establishment understands or can perform."

The relator makes, chases, and attaches to some of the fountain pens a gold band; but this is only ornamental, and adds nothing by way of utility. It appears from this evidence before the comptroller that what the relator does mainly relates to that feature of the fountain pen which alone makes it useful and salable; that the utility of the fountain pen entirely depends upon the mechanical art and skill displayed at the relator's factory, and wrought out upon the parts purchased and brought there. The result is a merchantable article worth four times as much as the cost of the separate pieces purchased. This mechanical skill, I think, may properly be said to create what is known as the "L. E. Waterman," or "Ideal," fountain pen. Without this mechanical labor, it cannot be said that such an article could be produced. It is not simply the putting together of parts manufactured by others. Something more is to be done. Skilled labor is required. The parts assembled are to be made useful. The one feature of a useful fountain pen has to be created. The capillary duct must be formed by a skillful union. Without this, the pen is worthless. The parts, as they come to the relator's factory, are neither adjusted nor adjustable in their then form. Everything remains to be done to make a serviceable or marketable article.

The fact that the relator buys the rubber rolled into the form as it appears in the manufactured pen, and also buys gold pens which are made by other specialists in the manufacturing line, and uses these after putting them through a process of its own, ought not, it seems to me, to operate to deprive the relator of all claim to be a manufacturer. The meaning of the term, as used by the legislature, must be taken in its ordinary and usually accepted sense. Whoever creates a useful thing by mechanical labor is entitled, usually, to be called a "manufacturer." The fact that he purchases, rather than makes, some of the parts, does not destroy that character. A boiler maker is a manufacturer, although he purchases the boiler plates rolled into form, and purchases also the tubes and the rivets. So with a cabinet maker, who buys the wood he uses in polished form or carved, and buys the cloth, hair, and leather he uses. No manufacturer of the finished product in this age works up the raw material. That is done by specialists all along the line. The practical manufacturer assembles the material he needs from all quarters in its most finished condition, and does the rest himself. The relator is not the manufacturer of the rubber fountain,— not wholly; nor is he of the gold pens wholly. But I think he may properly claim to be the sole manufacturer of the "L. E. Waterman," or "Ideal," fountain pen.

During the time for which the relator was assessed by the comptroller, its capital stock was $25,000, and its dividends were very large. They were large because of the difference in value of the article made and the value of the parts purchased. The relator was wholly engaged in manufacturing within this state, and so came within the exemption declared in the law of 1889. Under this law, for most of the term covered by this assessment, the obligation upon corporations was created. I do not think any of the cases cited, viz. People v. Wemple, 133 N. Y. 323, 31 N. E. 238; People v. Campbell, 144 N. Y. 166, 38 N. E. 990; People v. Same, 145 N. Y. 587, 40 N. E. 239; People v. Roberts, 145 N. Y. 375, 40 N. E. 7; People v. Same, 155 N. Y. 408, 50 N. E. 53,—declare any principle which, applied to this case, would lead to a different conclusion. The opinions expressed in the cases cited rather lead me to the conclusion reached that the relator is such a manufacturing corporation as entitles it to exemption from tax upon its capital stock.

In view of the disposition made of the first question, the second becomes unimportant.

The determination by the comptroller, for the reason that the relator was, during all the time covered by the assessment, exempt from taxation upon its capital stock, should be annulled, and the taxes paid to secure the right to the writ of certiorari should be repaid to relator, with $50 costs, besides disbursements. All concur.