# Richmond.

FIRST NATIONAL BANK OF RICHMOND, VIRGINIA AND ANOTHER
v. WILLIAM R. TRIGG COMPANY AND OTHERS.

January 17, 1907.

1. CONSTITUTIONAL LAW—*Class Legislation—Supply Liens—Code, Section 2485.*—Section 2485 of the Code (1887), as amended, giving prior liens to persons furnishing labor and supplies to mining and manufacturing companies is not contrary to Amendment Fourteen of the constitution of the United States as being class legislation denying to such companies the equal protection of the laws. The statute makes no discrimination against any company brought under its influence, but treats all alike under similar conditions, and that is decisive of the question.

2. MANUFACTURING COMPANY—*What Constitutes.*—A company which, in pursuance of charter powers, is engaged in manufacturing ships of all kinds and sizes, and all necessary furniture and fittings therefor, and also does original and repair work for manufacturing companies, and purchases large quantities of raw materials which it converts into the finished products, and has various shops, such as machine shops, copper shops, paint shops, and blacksmith shops, where work appropriate to such shops is done, is a manufacturing company within the meaning of section 2485 of the Code (1887), as amended, giving a prior lien to persons furnishing labor or supplies.

3. MECHANICS' LIENS—*Taking Note of Debtor.*—The mere taking of a note from the owner, the contractor, or some person who is liable for the payment of the debt, or amount due, does not defeat a mechanic's lien, or amount to a waiver thereof, in the absence of a showing that the taking of such note was intended as a waiver, or that it was taken as a payment of the account.

4. SUPPLY LIENS—*Perfecting Lien—Date of Account.*—If materials are furnishing a manufacturing company under a single contract and in fulfillment thereof, the items of the account are continuous, and the ninety days given the material man in which to file his account under Code, section 2486, is counted from the last item of the account, but if furnished under separate contracts the account must be filed within ninety days from the last item under each independent contract.

5. EQUITY—*Master's Report—Exceptions—Particularity Required—Appeal and Error.*—Exceptions to the report of a master commissioner are in the nature of special demurrers, and the party objecting must point out specifically the error complained of, otherwise the part not excepted to will be taken as admitted. Assignments of error in an appellate court stand on very much the same footing.

6. EQUITY—*Decree for Sale of Land—Account of Liens—General Rule—Exception.*—As a general rule there should be no decree to sell real estate which is subject to liens until the amount and relative priorities of such liens, and the rights of all persons relating thereto, have been first fixed and ascertained. The object of the rule is that the property may be so sold as to realize the best price therefor. But if, in a particular case, the application of the rule will work wrong and injury to the persons whose interests it was designed to advance and protect, the court will disregard it. The rule has no application to the sale of personal property.

7. INSOLVENTS—*Distribution of Assets—Specific Lien—Share in General Fund.*—A creditor holding a specific lien for a part of his debt may prove his entire debt against the other assets of an insolvent corporation without first allowing credit for the value of his specific lien.

8. JUDICIAL SALES—*When Resale Will Not be Decreed.*—Where property has been brought to the hammer under every reasonable safeguard that could be thrown around it to secure a fair and adequate price, and no upset bid is offered, and there is no evidence that a better price could be obtained at another offering, and the property is such as will rapidly depreciate in value, the sale should not be set aside.

Appeal from a decree of the Chancery Court of the city of Richmond in a suit in chancery under the style of *S. H. Hawes & Co.* v. *William R. Trigg Company and Others,* in which appellants proved their debts. From an adverse decree appellants appealed.

                                          *Affirmed.*

The opinion states the case.

*George Bryan* and *A. W. Patterson,* for the appellants.

*Munford, Hunton, Williams & Anderson,* for the appellees.

KEITH, P., delivered the opinion of the Court.

The William R. Trigg Company, a corporation organized under the laws of Virginia for the purpose of constructing, building and equipping ships, boats and vessels, on June 1, 1901, executed a deed of trust to the Commercial Trust Company of Philadelphia, as trustee, covering its plant and including all its machinery, fixtures and tools, together with all corporate rights, privileges and franchises, to secure the payment of certain bonds and coupons, amounting to $1,000,000, bearing five *per cent.* interest; and on June 14, 1902, another deed of trust was executed by the Trigg Company to the Richmond Trust and Safe Deposit Company, as trustee, to secure a further issue of bonds amounting to $1,000,000. It contracted also large debts to its employees and for supplies and material; and having become greatly embarrassed, Hawes and Company, in December, 1902, filed their bill setting forth its default in the payment of interest upon the bonds secured by deed of trust, averring its heavy indebtedness to banks and individuals upon promisory notes and open accounts, its total insolvency, and praying for the appointment of a receiver to take charge of its assets and to furnish certain uncompleted contracts theretofore entered into by it.

The answer of the company admits its insolvency and consents to the appointment of a receiver; and a decree was entered referring the cause to a commissioner to state an account, showing the property of the company and its value, the debts due by it, the liens and their priorities, and other matters which need not now be adverted to.

The commissioner returned a report, which was excepted to by the First National Bank of Richmond, Va., and by the Savings Bank of Richmond—

First. Because the report sustains the constitutionality of the labor and supply lien law of Virginia, whereas the said law is in conflict with the Fourteenth Amendment of the constitution

of the United States, which forbids class legislation by any state.

Second. Because it reports in favor of a large class of alleged supply lien claimants, whereas the property furnished by them to the defendant company was not in its nature supplies necessary to the operation of the plant, but raw material which was to be worked up into finished product for the market.

Third. Because the said commissioner holds that the defendant William R. Trigg Company is a manufacturing company, such as the statute in question contemplates, whereas he should have held that said statute did not extend to such a company.

Fourth. Because the commissioner holds that a supply or labor lien is good if filed within ninety days after the last item of claimant's bill becomes due and payable, without any regard to the connection between said items, whereas such bill must be an open or running account, forming one continuous course of dealing in order to bring it within the purview of said statute. This exception is directed particularly against the claim of Charles Este and others on page 63, et seq.

Fifth. Because the commissioner holds that the taking of a note by the claimant does not affect his right to the supply or labor lien. Indeed, he seems to be inconsistent when he so decides and then says that the lien for labor or supplies cannot be extended by special credit nor by the acceptance of a note for the amount of the bill, or any part thereof.

Sixth. Because the commissioner appears to have adopted as the law of this case some agreement of counsel whereby the proceeds of the furniture and furnishings reported by the receiver are to be equally divided between the bondholders and the supply lien creditors.

Seventh. Because the commissioner allows the claim of J. C. Cheatwood, who furnished teams and men to the defendant Trigg Company, whereas the statute does not contemplate a lien in favor of such claimant. And this exception is intended to apply likewise to the claims of John Tyler and Company and

Joseph Heppert, who occupy the same positions as Cheatwood.

Eighth. Because the commissioner has allowed the claim of Warner Moore and Company as a mechanic's lien, after rejecting same as a supply lien. This cannot be done, and the claim in question should have been wholly disallowed. Same exception as to claim of Baldwin & Brown and others. Because the commissioner has allowed the claim of the W. B. Bradley Construction Company as a supply lien, whereas said claim is not entitled to such position, as well for reasons applying to other cases already mentioned as because an account for furnishing and driving piles does not come within the statute.

Ninth. Because the commissioner reports in the alternative as to the meaning of the language "property forming part of its plant," whereas he should have reported the first position as his conclusion, and as embodying the true rule in this case; and this exceptant asks that said report be amended accordingly.

Tenth. Because the commissioner allows the claim of Joseph Bryan, trustee, for $20,038.75, on the grounds set out in the exceptions taken by Charles Este and C. C. Knight and Company.

Eleventh. This exceptant also unites in the exceptions to said report taken by the Standard Oil Company and the Pennsylvania Railroad Company filed in the cause.

On the 23d of May, 1905, the court entered a decree in which it upheld the constitutionality of the labor and supply lien law of the state of Virginia, and declared that the William R. Trigg Company is a manufacturing company within the terms and provisions of that statute, and, except as to certain matters which we shall not now consider, confirmed the report and decreed a sale of the property. On July 12, 1905, the commissioners reported that they had executed the decree of sale, as required, and had offered the property first in parcels and then as a whole; that for all the machinery included in the buildings and upon the premises, Frank Samuel was the highest bidder,

the price offered by him being $108,000; and that for the whole plant—that is to say, "the real estate, including the dock, and all the machinery, tools, appliances, etc."—Horatio G. Lloyd, chairman of the committee representing the first and second mortgage bondholders of the William R. Trigg Company, bid the sum of $350,000. The report then proceeds: "The undersigned having, in accordance with the aforesaid decree reserved the right in their advertisements and by public proclamations at the sale to report to the court for its acceptance the bid or bids which would realize the largest purchase price for the properties so sold, declared that they would recommend for confirmation the sale of the machinery, shafting, motors, cranes, hand and small tools contained in the buildings, together with the cranes, cableways, shear legs, and other machinery and yard equipment outside of the buildings, including the floating machine shop and floating derrick, sold as a whole to the aforesaid Frank Samuel for $108,000, and the sale of the real estate, including the dock, to Horatio G. Lloyd, chairman of the committee representing the first and second mortgage bondholders of the William R. Trigg Company, for $260,000. The undersigned therefore respectfully recommend the confirmation of the sales thus indicated to Frank Samuels and Horatio G. Lloyd, respectively, of the properties above described, and for the sums therein mentioned, the same aggregating $368,000."

To this report of sale the First National Bank and the Savings Bank of Richmond excepted, upon the grounds: "First, that the sale was premature, there having been no such account of liens as the law contemplates; and, second, that the amount offered for this property is grossly inadequate, the real estate being assessed at $61,000 more than the sum reported."

On June 20, 1905, the court entered a decree overruling the exceptions and confirming the report of sale; and from that decree the First National Bank and the Savings Bank of Richmond obtained an appeal, assigning in their petition the following errors:

That the supply lien statute, under which the claims are asserted in this case, is unconstitutional and void, being in conflict with the Fourteenth Amendment of the constitution of the United States, which provides that no state "shall deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws"; that section 2485 of the code, as amended, undertakes to impose a burden upon mining and manufacturing companies which is not placed upon anyone else, providing as it does that "all persons furnishing supplies to a mining or manufacturing company, necessary to the operation of the same, shall have a prior lien," etc.; that this statute clearly operates to discriminate against these two particular kinds of business, and also against corporations engaged in such business, though not against other persons doing a like business; and that the act in question is therefore class legislation of the most flagrant sort and stands condemned by the great weight of authority throughout the country.

We do not entertain such views with respect to the statute under consideration.

In *Va. Devel. Co.* v. *Crozer Iron Co.,* 90 Va. 126, 17 S. E. 806, 44 Am. St. Rep. 893, the question of the constitutionality of section 2486 of the code was considered. Judge Lewis in his opinion considers at length the decisions of the Supreme Court of the United States bearing upon the subject, and quotes from the opinion of Mr. Justice Field, in *Mo. Ry. Co.* v. *Mackey,* — 127 U. S. 205, 32 L. Ed. 107, 8 Sup. Ct. 1161, as follows: "The objection that the law deprives railroad companies of the equal protection of the laws . . . seems to rest upon the theory that legislation which is special in its character is necessarily within the constitutional inhibition, but nothing can be further from the fact. The greater part of all legislation is special, either in the objects sought to be attained by it, or in the extent of its application. . . . Such legislation does not infringe upon the clause of the Fourteenth Amendment, re-

quiring equal protection of the laws, because it is special in its character; if in conflict at all with that clause it must be on other grounds. And when legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them the equal protection of the laws, if all persons brought under its influence are treated alike under the same conditions." Referring to that decision and others which he cited, Judge Lewis continues: "These decisions, and the reasons upon which they rest, when applied to the present case, so fully meet the objections that have been urged to the legislation in question as to render further discussion of the subject unnecessary. The statute makes no discrimination against any corporation brought under its influence, but treats all alike under similar conditions; and that is decisive of the question. With the wisdom or unwisdom, the justice or injustice, of the statute we have nothing to do. It was for the Legislature to say whether its operation should extend to all persons and corporations, or to those corporations only which are specially mentioned; and the discretion of the Legislature in the matter is not subject to judicial interference."

Since that time the statute has been in various particulars amended in the light of experience, but nothing has been added to or taken from it which affects its constitutionality. Almost innumerable cases have arisen since that decision, in which this statute has been resorted to, in both state and federal courts, and rights claimed under it have always been enforced; and the wisdom of its enactment and the beneficence of its operation have been fully vindicated.

In *Bristol Iron & Steel Co.* v. *Thomas,* 93 Va. 396, 25 S. E. 110, this court, speaking as to the policy of such laws, quotes from Phillips on Mechanics' Liens, section 16: "Adjudications will be found declaring it to be against the genius of government to make distinctions between its citizens, or to prefer one class by granting them special privileges in derogation of the rules of common law, and consequently these laws should be

construed strictly; there are others equally numerous to the effect that correct policy dictates the fostering of this remedy for purposes of improvement of the country, and the protection of often unlettered men, and that a free interpretation should be given them in favor of the mechanic. It will be found, however, on a comparative examination, that courts have, with scarcely an exception, adopted either one or the other line of decisions, according as the statutes of the particular state were themselves equitable and just. If they bore with unnecessary severity upon others in favor of the mechanic, and palpable injustice resulted, they have uniformly declared they should not be aided by construction, and a strict interpretation should be placed upon the laws. If, on the other hand, they have secured the laborer the result of his toil and capital, with a due regard to the rights of all, constant expressions are to be found in the reported cases, declaring they should be favored." And with respect to our own law this court said in that case: "It cannot be justly criticised as unduly favoring those for whose benefit it was enacted. It merely serves to secure to the mechanic and laborer the result of his toil and capital, and, while doing justice to them, inflicts no injustice upon any, and should therefore be fairly, if not liberally, interpreted."

It is contended that the William R. Trigg Company is not such a manufacturing company as is contemplated by the supply lien law of this state. By its charter this company is given power to acquire and operate "the works, property, franchise, stock and bonds, rights, privileges and immunities of any individual, firm, or corporation, operating or owning a machine shop, dock or shipyard, or manufacturing railroad or marine equipment, or machinery of any description." The report of the commissioner states that the Trigg Company owns a large plant composed of various departments and shops, in which many kinds of machinery were used; that there was a machine shop, in which machinery and tools of different sorts were made and fitted for use; a punch shop, in which plates were sheared

and punched for riveting; a pattern shop, in which all sorts of patterns were made from wood; a blacksmith shop, containing large steam-hammers and also a number of smiths' forges, for the forging of billets and the performance of all sorts of smith work; a furnace shop for the bending and shaping of frames and plates; a carpenter shop, in which many kinds of wood-work was done; a joiner shop, equipped with special machinery, in which furniture was manufactured and the finer woodwork done; a paint shop, in which paints were mixed; a copper shop, in which sheet copper was manufactured into pipe; steam connections, ventilators, brass and copper castings, and other forms, and where galvanizing was done; a boiler shop for the manufacture of boilers; a foundry, in which iron and brass castings were made out of raw materials; that large quantities of raw materials of all sorts were purchased by the company and converted into finished products; and that the Trigg Company not only manufactured ships of all sorts and sizes, and all necessary fittings and furniture therefor, but it also did a considerable amount of original and repair work for other manufacturing concerns.

The dictionaries define "manufacture" as follows: "To make (wares or other products) by hand, by machinery, or by other agency. To work, as raw or partly wrought materials, into suitable forms for use." *Webster's Dict.* "To make or fashion by working on or combining material; to form or produce by some industrial process; fashion by hand or machinery, especially when done in considerable quantities and regular business. To work or fashion by labor into useful or desirable forms." *Standard Dict.* "To make or fabricate anything for use, especially in considerable quantities or numbers, or by the aid of many hands, or by machinery; work materials into the form of." *Century Dict.*

In *People* v. *Morgan,* 63 N. Y. Supp. 76, 79, the court says: "A boilermaker is a manufacturer, although he purchases the boiler plates rolled into form and purchases also the tubes and

rivets.  So with a cabinetmaker—he buys the wood he uses in polished form or carved, and buys the cloth, hair and leather he uses.  No manufacturer of the finished product in this age works up the raw material.  A practical manufacturer assembles the materials he needs from all quarters and does the rest himself."  *Hastings Malting Co.* v. *I. R. Brewing Co.* (Minn.), 63 N. W. Rep. 652; *Nassau Gas Co.* v. *City of Brooklyn,* 89 N. Y. 409; *Engle* v. *Sohn,* 52 Am. Rep. 103; *Norris* v. *Commonwealth,* 27 Pa. St. 496.

In *Commonwealth* v. *Keystone Bridge Co.,* 156 Pa. 501, 27 Atl. 1, a bridge company was held to be a manufacturing corporation, the court saying:  "It is quite true that in common speech we do not say that a bridge or viaduct, or house, or roof, is manufactured, but built, or erected, or constructed, and it might perhaps be true that a corporation whose only business was the erection of structures after the parts had been fashioned and fitted by others would not be accurately described as engaged in manufacturing.  However that may be—and the question is not free from doubt—the case before us is very different. The defendant is unquestionably a manufacturing company up to the point when the various parts—beams, girders, rods, bolts, and the rest—are ready to be put together in order to form the complete structure for which they were intended.  The preparation of these parts from material, either raw or unfinished, is clearly manufacturing within any accepted definition of the word; and if in all cases the transaction was finished by a sale of the parts to the purchaser who would himself put them together and thus complete the structure for use, the exclusive manufacturing character of the corporation could not be questioned.  Is this character destroyed simply because the defendant, after having manufactured the various parts of a contemplated bridge, or viaduct, or turntable, or roof, goes one step further and finishes the structure?  Upon reason, we think this question ought to be answered in the negative."

*Columbia Iron Works* v. *National Lead Co.,* 127 Fed. 99, 64

L. R. A. 654, is very much in point. "The material for the construction and repair of vessels came to the plant largely in the unmanufactured and raw state, and it was converted from the crude and raw material by hand labor and machinery into the forms and shapes and designs requisite for the construction and repair of vessels. No doubt the question is to be determined upon the consideration of what the corporation actually does rather than what it is authorized by its charter to do. But the business of this corporation appears to be that which it was authorized to engage in—namely, the building and repairing of ships and principally in building. We think that upon these facts the finding that the corporation was principally engaged in manufacturing was justified. The principal objection urged to this conclusion is that the building and sale of ships is neither a manufacturing nor mercantile business, and many cases are cited which are supposed to be in point, where various forms of construction have been held to be not within the purview of the language of the bankruptcy act, or similar language employed in other legislation, such as the construction and operation of mining plants for the getting out and sale of ores and coals, dry docks, floating docks, railroads and depots, and other constructions of a fixed and localized character. . . . But we do not think the similarity of such works and business to that of building vessels employed in commerce is such as to furnish a rule for the latter. The business in question is the building of articles of commerce, as much as the building of locomotives and railroad cars, or the manufacture of their constituent parts. The distinction would seem to run along the line of those articles which are more or less fixed in place, and not ordinarily the subjects of bargain and sale, as articles of commerce, as contradistinguished from those which are movable and ordinarily regarded as subjects of sale and manual transfer—articles of trade in the common course of mercantile business."

We think that the facts stated by the commissioner in his report abundantly justify his conclusion that the Trigg Com-

pany is a manufacturing company within the meaning of our statute, and that conclusion is sustained, not only by lexicographers, but by the adjudicated cases.

In support of another assignment of error, it is claimed that many claimants for supplies furnished have lost their liens by accepting notes in payment of their accounts. As the result of giving a note depends upon the intention with which it was given and received, and may therefore be affected by extraneous evidence, we might decline to express any opinion upon this assignment of error for reasons which will be stated more at large when we come to another class of exceptions. But as the determination of the general principle may be helpful we hold that the mere taking of a note from the owner, the contractor, or some person who is liable for the debt or amount due, does not defeat a mechanic's lien, or amount to a waiver thereof, in the absence of a showing that the taking of such note was intended as a waiver, or that it was taken as a payment of the account. 20 Amer. & Eng. Encl. Law 498.

Another error assigned is because the court holds that a labor or supply lien is good if filed within ninety days after the last item of the account becomes due and payable, without any regard to the connection between the items, whereas such account must be a running and open account, forming one continuous course of dealing in order to bring it within the purview of the statute.

We think the law on the subject is correctly stated in *Frick* v. *Railroad Co.*, 86 Fed. 725, 32 C. C. A. 31, where it is said: "Where materials and labor are furnished to a railroad as they are from time to time ordered, and not in fulfillment of a single contract, the limitation within which a lien therefor may be perfected begins to run against each item at the time it is furnished."

"If the materials were furnished under a single contract, and were in fulfillment thereof, the items of the account would be continuous, and the material man would have ninety days from

the date of the last item within which to file his account and perfect his lien. . . . On the other hand, if the several items of the account, or a portion of them, are furnished under separate contracts, then the lien should have been filed ninety days from the date of the last item under each independent contract." *Cent. Trust Co.* v. *C. K. & T. Ry. Co.,* 54 Fed. 598.

With respect to the other exceptions to the report of the commissioner of accounts, upon which assignments of error in this court are made, we are of opinion that they are not sufficiently definite and certain.

In *Wilkes* v. *Rogers,* 6 Johnson's Rep. 566, it is said that exceptions to reports of masters in chancery are in the nature of special demurrers, and the party objecting must lay his finger on the error, otherwise the part not excepted to will be taken as admitted.

In *Story* v. *Livingston,* 13 Peters 359, it is said that exceptions to the report of a master must state, article by article, the parts of the report which are intended to be excepted to; that the exceptions are in the nature of a special demurrer, and the party objecting must point out the error, otherwise the parts not excepted to will be taken as admitted.

In Sands' Suits in Equity, sections 547, 548, 549 are to the same effect. See also 2 Robinson's Old Practice, page 383.

In *Orr* v. *Pennington,* 93 Va. 268, 24 S. E. 928, speaking of petitions for appeal, it is said: "The petition required is in the nature of a pleading and should state the case which the party applying for the appeal wishes to make in the appellate court. It ought to assign clearly and distinctly all the errors relied on for a reversal of the case so that the opposite party may know what questions are to be raised in the appellate court and not have new questions sprung upon him at or just before the hearing of the cause, when there may not be sufficient time or opportunity for meeting them."

Barton's Chy. Pr., at section 201, says that exceptions being in the nature of special demurrers, "the party objecting must

point out the error, otherwise the part not excepted to will be taken as admitted, not only as to the principles but as to the evidence on which they are founded. A general assignment of errors is insufficient unless specific errors are shown; and where one excepts to an account containing a number of items of charges he must indicate the specific charges of which he complains, and he cannot by a general exception impose the burden upon the court of examining every item in the account to detect the error—the same rules being also applicable to reports of special commissioners of sale, if not to all reports of officers made in chancery suits. If a general exception be taken without specification, and the court finds the master right in any one independent particular, the exception must be overruled just as at law a demurrer to the whole declaration must be overruled if any substantial part of it be good."

We have spoken somewhat indiscriminately of exceptions to commissioners' reports and of assignments of error in petitions for appeal. They depend in great degree upon the same principles, and the exception in the trial court is usually the basis for error assigned in the appellate court.

In 2 Cyc. Law & Procedure, page 980, it is said: "An assignment of errors is in the nature of a pleading, and in the court of last resort it performs the same office as a declaration or complaint in a court of original jurisdiction. The object of an assignment of error is to point out the specific errors claimed to have been committed by the court below in order to enable the reviewing court and opposing counsel to see on what points plaintiff's counsel intends to ask a reversal of the judgment or decree, and to limit discussion to those points."

The reason for the rule is well stated in *Clements* v. *Hearne,* 45 Tex. 415: "To require the appellee or the court to hunt through the record for every conceivable error which the court below may have committed, when none has been pointed out by the party complaining of the judgment, would obviously be unreasonable and oppressive on the party recovering judgment,

and most burdensome on this court, unnecessarily impeding the progress of its business; and, by the confusion and uncertainty which it would beget as to the questions on which the case was decided in the court below, destroy its character as an appellate tribunal; and by the multiplicity of the questions for discussion tend much more to confusion and error in its own decisions than the correction of errors which may in fact have occurred in the District Court."

There are nearly one hundred claims presented in this record, running through hundreds of printed pages, and it is eminently a case in which counsel, in the exceptions in the court below and the assignments of error in this court, should, in the language of Chancellor Spencer in *Wilkes* v. *Rogers, supra,* be required to "lay his finger on the error."

It is claimed on the part of appellants that the decree of sale was premature, there having been no sufficient account of liens, as the law contemplated.

The decree of sale reserves for future determination "all questions as to the validity or priority of any claim or lien of any party to this cause, so far as such claim or lien exists in relation to any property of the defendant corporation, other than the real estate conveyed in said two mortgages, and the rights appurtenant thereto, and the personal property forming a part of its plant, but this qualification and reservation shall not impair the conclusive character of this decree as to the amount, character and location of such real estate and the personal property forming a part of the plant of the defendant company, and of the amounts and priorities of the liens subsisting thereon, and the right of the court to decree an immediate sale of the same for the satisfaction of the liens so established. And the court doth further reserve for future consideration and decision all questions as to the fund or funds upon or against which the amounts herein ordered to be paid on account of labor liens and mechanics' liens established in this cause shall be eventually charged; and all questions as to the rights of the aforesaid

trustees, or either of them, to demand that the amounts so paid on account of said labor liens and mechanics' liens shall be finally charged in whole or in part to or upon the funds which may be derived from the sale of the property of the defendant William R. Trigg Company, other than that covered by its two mortgages aforesaid."

This court has in very many cases held that land should not be decreed to be sold where there appeared to be liens binding upon it until the amount of these liens and their order of priority had been fixed and established. The principle on which these decisions are founded is "that a sale without first removing a cloud from the title and adjusting and settling rights in dispute, and without previously ascertaining and determining the liens and encumbrances, the amounts and priorities, tends to a sacrifice of the property as to creditors by discouraging them from bidding when they probably would have bid for the protection of their own interests if the rights of all parties had been previously ascertained and fixed with reasonable certainty." It is first to be observed that the rule applies only to the sale of real estate; it has no application to the sale of personal property.

In *Cole's Admr.* v. *McRae,* 6 Rand. 718, one of the earliest cases upon this subject, the rule is stated and the reason given, viz: that it is premature and erroneous to decree the sale of real estate without first establishing the liens upon it, "because it has a tendency to sacrifice the property by discouraging the creditors from bidding, as they probably would if their right to satisfaction of their debts, etc., had been previously ascertained. Such a decree may be proper as it regards the sale of chattels, because they are perishable, liable to be wasted, and no sacrifice need be apprehended, because they may be sold in detail."

The underlying reason for the rule thus stated pervades every case upon the subject from that day until the present time.

Now, in the case before us, the property sold consisted of real estate and personal property so connected and related as to

render their market value in a degree mutually dependent. The object of the rule in question—indeed the principal object in all cases in a court of chancery—is that property may be so sold as to realize the best price. The rule with respect to the ascertainment of the liens and their priorities, the time, manner and terms of sale, are all but means to that end, and where a court can see plainly that a strict adherence to a course of procedure, which in the great mass of cases is beneficial and has therefore by frequent application acquired the force of established rules will, in a particular case, work wrong and injury to those whose interests they were designed to advance and protect, it will not sacrifice the object to the means, but will so modify the application of the means in the particular case as to promote and advance the essential object.

But there is another view. The rule under consideration is established in order to enable creditors to bid at the sale with an intelligent knowledge of their rights, knowing the amount of their liens and their relation to the liens of others. In this case the two deeds of trust which were the paramount liens upon the property amounted, principal and interest, to rather more than two and a quarter millions of dollars. It is not within the bounds of reason that this property could under any circumstances have been made to bring enough to satisfy these deeds of trust. No subsequent creditor, however eager, would have been guilty of the folly of offering a price sufficient to give him an interest in the proceeds.

But it is said, in answer to this view, that the property sold at a grossly inadequate price; that if the liens had been ascertained it might have brought more, and had it brought more it would have served to diminish, if not to extinguish, the preferred liens, and to lessen the sum upon which the debts represented by those liens would be entitled to claim a *pro rata* distribution of the general fund in the cause. That on the face of it would be a very contingent and remote advantage. It might safely be deemed to come within the rule *"De minimis non curat lex"*;

but there is another answer, which is conclusive.   Although the bondholders were secured by the first and second mortgages, they would have been entitled to prove their entire debt as against the fund for distribution.   This is not the rule in bankruptcy, we are aware, for in the bankruptcy courts the specific lien is first exhausted, and only the balance due is provable as against the general fund; but the English chancery and our courts have established a different rule.

In *Pace* v. *Pace,* 95 Va. 792, this court, after reviewing many decisions, said:  "There are many cases holding that where a creditor of an insolvent person who is dead, or has made an assignment for the general benefit of creditors, holds collateral security for his debt, and after the death, or the assignment, of his debtor realizes on the collaterals, he may, notwithstanding, prove against the decedent's estate, or the assigned estate, for the full amount of his debt as it stood at the time of his death, or assignment"; referring to the opinion of Judge Taft in *Chemical National Bank* v. *Armstrong,* 59 Fed. 380, 28 L. R. A. 231, where the syllabus dealing with this subject is as follows:  "Creditors of an insolvent national bank cannot be required, in proving their claims, to allow credit for any collections made after the date of the declared insolvency from collateral securities held by them."   And in the course of the opinion, Judge Taft, after considering a great number both of English and American cases concludes that the great weight of authority is strongly opposed to the view that a creditor with collateral shall be thereby deprived of the right to prove for his full claim against an insolvent estate.

Such being our view of the law on this point it is obvious that nothing short of a bid sufficient to satisfy both mortgages could have affected the distributive share of the mortgage creditors. The rule under consideration, as stated by Judge Burks, rests upon the probability that creditors will bid for the protection of their own interests.   That probability vanishes when confronted with the facts in this case, which establish a probability amount-

ing to a certainty that such would not have been the case; and upon the reason ceasing the rule ceases with it. If the value of the property sold could be estimated by the amount of the debts which the company succeeded in contracting, the price it brought was grossly inadequate. It was brought to the hammer, however, under every reasonable safeguard that could be thrown around it to secure a fair and adequate price. There is no suggestion that the sale was not in every respect made honestly and judiciously. The property is of a nature which commands but a limited market; the real estate itself is such that it will be rapidly impaired in value by delay. Second-hand machinery never brings more than a small percentage of its cost; and delay would be more likely to diminish than to increase the market value of the property under consideration. There was no upset bid and no evidence of any kind that another offer would bring a better price.

Upon the whole case we are of opinion that the decree appealed from should be affirmed, and the cause remanded to the lower court for further proceedings in accordance with this opinion.

*Affirmed.*