CITIZENS' & MARINE BANK OF NEWPORT NEWS, VA., et al. v. MASON (two cases).

In re TAKA–KOLA BOTTLING CO., Inc.

(Circuit Court of Appeals, Fourth Circuit. October 21, 1924.)

Nos. 2232, 2242.

1. Corporations ⬗370(2)—Persons are charged with knowledge of restrictions in duly recorded charters of corporations with which they deal.

Persons are charged with knowledge of limitations and restrictions contained in duly recorded charters of corporations with which they deal.

2. Corporations ⬗480—Bottling company held not "manufacturing company" within statute giving lien for supplies furnished such company superior to deeds of trust.

Corporation authorized by charter to do a general bottling business, sell and dispense soft drinks, and to own mineral springs or wells, and which was engaged in selling bottled drinks consisting of syrup purchased from others,

mixed with carbonated water, *held* not a "manufacturing company" within Code Va. 1919, § 6438, giving lien for supplies superior to liens of deeds of trust.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Manufacturer.]

3. **Mortgages** ⟨⟩ 151(3)—Statute giving superior lien for supplies held invalid as to liens existing prior to its date and valid as to subsequent liens.

Code Va. 1919, § 6438, giving lien for supplies furnished manufacturing company superior to liens of deeds of trust, *held* invalid under Const. art. 1, § 10, as to liens existing prior to its date, and valid as to those arising thereafter.

On Petition to Superintend and Revise, in matter of law, proceedings of the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk, in Bankruptcy; D. Lawrence Groner, Judge.

In the matter of the Taka-Kola Bottling Company, Inc., bankrupt, in which Bernard Mason, trustee, and assignee of the Columbia Chemical Corporation, claimed a lien. The District Court reversed action of referee declaring lien invalid and declared in favor of claimant as preferred lienholder, and the Citizens' & Marine Bank of Newport News, Va., and another, appeal from the District Court's order, and file petition to superintend and revise the proceedings in the District Court. Reversed.

R. M. Lett, of Newport News, Va. (T. Gray Haddon, of Richmond, Va., on the brief), for petitioners and appellants.

W. J. Henson, of Roanoke, Va. (Jackson & Henson, of Roanoke, Va., and Alfred Anderson, of Norfolk, Va., on the brief), for respondent and appellee.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WADDILL, Circuit Judge. These proceedings involve the validity of a lien for an indebtedness due appellee for supplies furnished the Taka-Kola Bottling Company, the bankrupt herein, to be used in its business, and for which it is claimed under the Virginia statute the appellee is entitled to a prior lien on the franchises, gross earnings, and real and personal property used in operating its plant, superior to that of the appellants and petitioners, who hold liens secured by trust deeds upon the bankrupt's property.

The supply lien was claimed under section 2 F.(2d)—23

tion 6438 of the Code of Virginia 1919, which at the time of furnishing the supplies was in effect, but which as to supplies furnished mining and manufacturing companies has since been repealed. Acts of Assembly Va. 1922, p. 13, February 11, 1922; Pollard's Supp. to Code of Virginia 1922, p. 489.

Appellants and petitioners assail the validity of the claim as one entitled to a lien, because the statute under which the same is sought is alleged to be unconstitutional, and because the bankrupt company is neither by its charter, nor in what it did, a manufacturing company within the meaning of the act.

The referee, upon full consideration of the questions raised, adjudged the lien to be invalid, and the holder thereof to be only an unsecured creditor against the bankrupt's estate. Upon application to the District Court to review the ruling of the referee, that court by its order entered on the 6th of March, 1924, reversed the action of the referee, and held that the section of the Code in question was invalid only as to deeds of trust executed prior to its date, and that the bankrupt company was a manufacturing company as defined by the act, and decreed in favor of the appellee as a preferred lienholder for the amount of its debt, and entitled to priority over the trust deeds executed subsequent to the passage of the act awarding a lien, on the 13th of January, 1920, from which action this appeal is taken.

Three questions arising upon the record are presented for our consideration, which are aptly set forth in the assignments of error, viz.: That the Taka-Kola corporation by its charter was not such a company as was authorized to do a manufacturing business within the purview of section 6438 of the Code; that the business conducted by it was not a manufacturing business, nor were the supplies furnished for which the lien is claimed such as the statute authorized a lien for; and that the act under which the lien is claimed was void because in violation of section 10 of article 1 of the Constitution of the United States, as impairing the obligation of contract. These will be considered in the order named.

First. The charter of the company will be looked to to ascertain its powers. It provides as follows: "To do a general bottling business, selling at wholesale or retail, and dispensing soft drinks, and to own mineral springs or wells, and to dispense, job and sell water of all sorts."

It will be conceded that the corporation is a creature of the statute, and is limited to the authority granted in its charter, which is required to be recorded as well in the office of the state corporation commission as in the clerk's office of the city or county of the home office of the company. This recordation is required to the end that the public may be advised of the authority of the corporation to do business.

The Supreme Court of the United States, in considering the authority of corporations, aptly states the same as follows:

"We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such and such only as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others." Thomas v. Railroad, 101 U. S. 71, 80, 82, 25 L. Ed. 950; Clark on Corporations, p. 67; 2 Fletcher on Corporations, § 783, and cases cited.

[1, 2] Persons dealing with corporations whose charters are duly recorded, are charged with knowledge of the limitations and restrictions contained therein. Radford Water & Power Co. v. Dunlap, 128 Va. 658, 674, 105 S. E. 257. A careful examination of the charter of this company, as bearing upon its authority to do business, gives but little support to its being a manufacturing company, within the intent and meaning of section 6438, under which the claim is made. Counsel for appellee frankly concedes in argument that the real question in this case turns upon whether the bottling business, as usually conducted, is a manufacturing business. We can but feel that considering its charter in the light stated, and having due regard to just what the actual business so far as bottling carbonated water consisted of, there is but little to give color to the claim that the provision in the charter made the bankrupt company a manufacturer within the spirit and meaning of the law.

Second. Considering the question of whether or not the business conducted was in point of fact a manufacturing business, and the supplies furnished such as the statute authorized a lien for, the statute itself and the fact of just what supplies were furnished, and what was done in connection with the bottling business, becomes material. The statute is briefly as follows:

"Sec. 6438. *Lien of Employees, etc., of Transportation Companies, etc., on Franchises and Property of Company.*—All conductors, brakemen, engine drivers, firemen, captains, stewards, pilots, clerks, depot or office agents, storekeepers, mechanics, traveling representatives or laborers, and all persons furnishing railroad iron, engines, cars, fuel, and all other supplies necessary to the operation of any railway, canal, or other transportation company, and all clerks, mechanics, traveling representatives, and other persons who furnish their services, labor or supplies to any mining or manufacturing company, * * * shall have a prior lien on the franchises, gross earnings, and on all the real and personal property of said company which is used in operating the same to the extent of the moneys due them by said company for such wages or supplies, and no mortgage, deed of trust, sale, hypothecation, or conveyance executed since the first day of May, eighteen hundred and eighty-eight, shall defeat or take precedence over said lien. * * *"

The facts found are as follows:

"The materials supplied by the Columbia Chemical Corporation to the bankrupt were in the form of syrups. The bankrupt company, after diluting the syrup thus supplied, poured it into the bottles and sold it in that form.

"The process used by the bankrupt in diluting and carbonating the syrup was as follows:

"The carbonic gas was bought in tubes and the gas therefrom discharged into plain cold water, sweetened with sugar and thoroughly mixed with it. A portion of the syrup was then poured into the bottle and the bottle then filled with this carbonated water. It was then crowned and kept cool for the purposes of sale. In this process considerable machinery was used, especially in the processes of washing and crowning the bottles. A refrigerating machine was used for cooling purposes. Another machine was used in mixing the gas and water and putting the mixture into the bottles.

"The same materials which were furnished by the Columbia Chemical Corporation for use by the bankrupt company, were also furnished to sundry soda fountains. These same syrups were diluted and mixed at the soda fountains with the same character of carbonic gas, cooled and supplied for drinking purposes out of the glass instead of out of the bottle as furnished by

the bankrupt. The same materials were used and the same result produced, except that the drink in one case is poured into the bottle and the other in the glass.

"It further appeared in evidence that after the plant in Norfolk was built and established, at a later date than the place at its home office in Newport News, the bankrupt made a practice, for a part of its business, of buying from the wholesale houses ingredients in packages, upon each of which packages there was a formula by which the ingredients could be mixed in a barrel, and, after being stirred about with a wooden paddle, could be used in the same manner as the syrup furnished by the Columbia Chemical Corporation. This process was used in about half of the business in the Norfolk plant, after it was started in the year 1920."

Respecting the statute itself, it may not be amiss to note that as originally drawn, it applied only to railroads, canals, and other transportation companies, and that by subsequent amendment, mining and manufacturing companies were added. The word "supplies" has now been omitted from the act, so far as mining and manufacturing companies are concerned. The Legislature, in placing railroad, canal, and other transportation companies and mining and manufacturing companies all in one section, plainly had in mind corporations extensive in character, and at least those actually and chiefly so engaged, and not such as might incidentally, from a technical viewpoint, be engaged partially in manufacturing something used, or capable of being used in connection with the business in hand. "Mining or manufacturing companies" in this act manifestly was intended to apply to companies strictly engaged in the businesses named, which considered along with other portions of the section applicable to railroad, canal, and other transportation companies, clearly indicated the actual engaging in one of the five things named in the act, to wit, operating a railroad, canal, or transportation company, or a mining or manufacturing business.

In connection with the finding of the referee, the statement of the bankrupt's foreman is, in part, as follows:

"He said about fifty (50%) per cent. of the syrup used was already bought finished, that we made some of the syrups here, bought the ingredients and made them. That in making them we would buy all the ingredients from one house as a rule, and the formula came with each of the ingredients and of the preparations we used and we mixed them according to formula. We made a plain syrup of sugar and water and added acids and colors to the sugar and water.

"The finished article which we bought was purchased in barrels and we just tapped the barrels and turned it into the syrup. To produce carbonated water which was used, we bought carbonic gas in tubes and that is turned into the carbonated water, and then it is agitated, churned in there, and this water and gas is thoroughly mixed, and goes to the filler and into bottles. It is just plain water and this gas from the carbonate tube.

"To prepare the water, we use a refrigerating machine, which brought the water down to about forty degrees or lower, if we could."

One cannot fail to be struck from the language used by the witness and the findings of fact by the referee, especially in the light of the authority conferred in the charter of the company to do business, how unlike anything approaching manufacturing, or the doing of a manufacturing business, is involved, or was being done. The charter is entirely silent as to the company's purpose to engage in a manufacturing business. The language used makes no reference to its intention to do so; on the contrary, it provides for something in no way at least necessarily connected therewith. "To do a general bottling business" does not mean or include the manufacture of bottles, and "dispensing of soft drinks" and to "own mineral springs or wells" and to "dispense, job and sell waters of all sorts," gives no authority to manufacture anything; but only to dispense, that is, sell soft drinks, and to own mineral springs or wells, and to dispense, job, and sell waters of all sorts. Every suggestion as to what was the purpose of the business, as shown by the charter, indicated buying and selling, and in no one of the provisions, either singly or taken as a whole, is there any indication of an intention to manufacture anything. What was to be done under this charter was plainly a business that could not be termed manufacturing, as distinguished from the mere acquiring of ingredients, and preparing the company's wares for sale, which required nothing of skill, ingenuity, or knowledge, and from the result of which nothing new from a manufacturing viewpoint was produced. The mere bottling for sale and selling of carbonated waters, with the addition of purchased ingredients, was mainly

the case here, and in no sense could be termed manufacturing.

The most favorable view that can be taken of this charter is that the bottling business, for which it provided, was an incident to selling and dispensing at wholesale and retail soft drinks; the words "selling at wholesale and retail and dispensing soft drinks" being explanatory and descriptive of the bottling business. It will be found exceedingly difficult, in the light of the facts and circumstances and testimony of this case, to distinguish what was done in connection with the bankrupt's business from that of the ordinary soda fountain. The findings show indisputably the similarity of the two businesses.

An analysis of the provisions of this charter as to its purpose shows it was granted (a) "to do a general bottling business." This language taken alone makes no provision for the manufacture of anything. (b) "Selling soft drinks at wholesale and retail" can have but one meaning; that is, to sell and dispense soft drinks at wholesale and retail. (c) "To own mineral springs and wells, and to dispense, job, and sell water of all sorts." This language means only that the company could acquire its own springs or wells from which to dispense, job, and sell waters of all sorts; that is, plain water as well as soft drinks. Certainly nothing of a manufacturing business is apparent from these provisions of the charter; and if to do a general bottling business constitutes, within the meaning of the Virginia statute, such a manufacturing company, and makes its business that of a manufacturer, the inquiry may well be made of what it is a manufacturer, and what part of its proposed business is manufacturing, so as to enable those doing business with it to secure liens superior to those of others, holding lawful liens under the laws of the state. Had it been within the thought of any one that such a favored position could ever be asked or maintained by those doing business with a corporation such as the one here, would it not, in justice and fairness, have been the duty of this company to ask for a charter designating in terms its business as a manufacturer, and clearly indicating upon its face what its real purpose was, and what it was to manufacture, to the end that the innocent holder of a prior lien might not have its rights imperiled by such a result as the contention now made, if sustained, would bring about. The charter should clearly show the right of those claiming supply

liens, to be entitled to the same; and at the very threshold it must be entirely apparent that a corporation against which such a lien is sought is such an one, and its business such as the statute contemplates a lien may be procured against.

A careful examination of the authorities bearing on what are and what are not manufacturing corporations will show much contrariety of view on the subject; but it will be found that the cases arise almost entirely over exemptions from taxation granted in favor of new enterprises, in which the courts have adopted the view or rule of construction most favorable to the existence of the business sought to be encouraged. Cases like the one here, in which a lien is sought against a corporation whose charter fails completely to specify such a business as the statute provides a lien for, are rare, if indeed any exist; and those in which the question arises by reason of the character of the business done, as distinguished from infirmity appearing on the face of the charter, but few, if any, will be found to sustain the claim of lien asserted here; and from our viewpoint, the better opinion and the great weight of authority make clear that under the facts and circumstances of this case, and in the light of the statute, no lien exists in favor of the appellee for the claim in suit. Only a few of the cases bearing especially on the subject need be cited.

In Hartranft v. Wiegmann, 121 U. S. 609, 7 S. Ct. 1240, 30 L. Ed. 1012, the Supreme Court had under consideration the question of the dutiability of certain shells which it was claimed were ornamentally manufactured so as to make them dutiable. The court, at page 615 (7 S. Ct. 1243), said:

"They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character or use from that of a shell. The application of labor to an article, either by hand or by mechanism, does not make the article necessarily a manufactured article, within the meaning of that term as used in the tariff laws. Washing and scouring wool does not make the resulting wool a manufacture of wool. Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton."

In Tidewater Oil Co. v. United States, 171 U. S. 210, 18 S. Ct. 837, 43 L. Ed. 139, the court likewise had under review the question of the dutiability of certain shooks imported from Canada, and used in the

manufacture of boxes. The court at page 211 (18 S. Ct. 837) held that boxes made in the United States from shooks imported from Canada, which shooks were packed in separate parcels representing in each parcel a number of sides or a number of tops or bottoms, all approximately of the length required, and each part to be taken from the corresponding bundle trimmed to the exact length, and then nailed together into a box, did not constitute such a manufacturing of boxes as would entitle the maker of the boxes to a drawback under United States custom laws on imported materials, to be wholly manufactured in the United States.

In Anheuser Busch v. United States, 207 U. S. 556, 28 S. Ct. 204, 52 L. Ed. 336, the Supreme Court in determining whether an importer of certain corks from Spain as raw material was entitled to a drawback of the tariff tax thereon by reason of their use in connection with the bottling of beer, and in which it was necessary to subject them to many processes, held that what was done did not constitute manufacturing, and on page 562 (28 S. Ct. 206), said: "* * * Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in Hartranft v. Wiegmann, 121 U. S. 609. There must be transformation; a new and different article must emerge, 'having a distinctive name, character or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork. The process is the preparation of the encasement of the beer, and assimilates this case to Jos. Schlitz Brewing Co. v. United States, 181 U. S. 584."

In New Orleans v. Mannessier, 32 La. Ann. 1075, the question for determination was whether a vendor of ice cream, made by himself, by the use of a steam engine and large and complicated machinery in its manufacture, was a manufacturer entitled to exemption from a license tax under the license law. The court held a person thus making ice cream was not a manufacturer within the meaning of the statute, or in any other sense. The court further held that a steam engine and a complicated apparatus and large force needed to produce the defendant's goods did not constitute a manufacture, and the confectionery business could not thus be magnified into a manufacturing establishment.

In People ex rel. Empire State Dairy Co.

v. Sohmer, 218 N. Y. 199, 211, 112 N. E. 755, L. R. A. 1917A, 48, a decision involving the business of the pasteurization of milk, bearing a close analogy to this case, will be found to contain a full and comprehensive discussion of this general subject, to which, and the cases therein cited, special reference is made.

Union Pacific Tea Co. v. Roberts, 145 N. Y. 375, 40 N. E. 7; New Orleans v. Le Blanc, 34 La. Ann. 596; New Orleans v. Coffee Co., 46 La. Ann. 86, 14 So. 502.

Counsel for appellee have cited us to quite an array of authority tending to support their contention, and to which we have given much attention; but are forced to the conclusion that while they tend to show a degree of uncertainty as to what constitutes a manufacturer or manufacturing, dependent necessarily upon the facts of the several cases, neither the cases cited, nor any other which we have discovered, would justify or warrant our holding the corporation in this case, in the light of its charter provisions, to be such manufacturer, or engaged in such manufacturing business as would come within the spirit of the Virginia statute giving supply liens as claimed.

Our attention has been called by counsel for appellants to a decision of the Court of Appeals of Virginia, Bank v. Trigg, 106 Va. 327, 56 S. E. 158, and by counsel for appellee to the case of In re West Norfolk Lumber Co., 112 F. 759, a decision of the District Court for the Eastern District of Virginia, as throwing light upon what in Virginia is deemed a manufacturing company. In Bank v. Trigg, supra, 106 Va. 327, 56 S. E. 158, the second section of the syllabus is as follows:

"2. Manufacturing Company—What Constitutes.—A company which, in pursuance of charter powers, is engaged in manufacturing ships of all kinds and sizes, and all necessary furniture and fittings therefor, and also does original and repair work for manufacturing companies, and purchases large quantities of raw materials which it converts into the finished products, and has various shops, such as machine shops, copper shops, paint shops, and blacksmith shops, where work appropriate to such shops is done, is a manufacturing company within the meaning of section 2485 of the Code (1887), as amended, giving a prior lien to persons furnishing labor or supplies."

In the West Norfolk Case, supra, 112 F. 759, the court, considering the report of the referee before whom much testimony was

taken bearing on the status of the company, held the bankrupt company, engaged in the manufacture of rough lumber into flooring, ceiling, box shooks, and other dressed material, to be a manufacturing company within the contemplation of the Virginia statute.

Neither of these cases, in our view, give support to the claim of the appellee to a supply lien, and on the contrary strongly tend to show that the companies covered by the two cases were in reality manufacturing companies largely engaged as such.

[3] Third. Considering the alleged unconstitutionality of the Virginia supply lien law raised by the appellants, we are convinced that the ruling of the trial court holding the same invalid as to liens existing prior to its date, and valid as to those arising thereafter, is free from error, and is supported as well by the decisions of the supreme court of appeals of Virginia, as by those of this circuit. Virginia Development. Co. v. Crozer Iron Works, 90 Va. 126, 17 S. E. 806, 44 Am. St. Rep. 893; Liberty Perpetual B. & L. Co. v. Furbush, 80 F. 631, 26 C. C. A. 38 (C. C. A. 4th Cir.); Fidelity Insurance Trust & Safe Deposit Co. v. Roanoke Iron Works, 81 F. 439, 453; Crowther v. Fidelity Trust & Safe Deposit Co., 85 F. 41, 29 C. C. A. 1.

The decision of the District Court will be reversed.

Reversed.